[Crim. No. 1046.  Second Appellate District, Division Two.—March 12, 1924.]

THE PEOPLE, Respondent, v. CRUZ SALAZ, Appellant.

[1] CRIMINAL LAW — MURDER — SELF-DEFENSE — EVIDENCE — PRESUMPTION OF GUILT. — In a prosecution for murder, where the evidence of the people is such that the jury cannot find that the killing was done by defendant except upon the latter's admissions, which carry, in close and immediate connection with proof of the killing, circumstances of necessary self-defense, there is, at the close of the people's case, no presumption against the accused that he committed an unlawful homicide.

---

1.  Self-defense by one who has made an attack or voluntarily entered into a rencounter, note, 109 **Am. St. Rep.** 804. See, also, 13 **Cal. Jur.** 632; 13 **R. C. L.** 813.

[2] ID.—EVIDENCE—SURROUNDING CIRCUMSTANCES—VERDICT.—In such prosecution it does not necessarily follow that defendant's account of the killing, though uncontradicted by direct evidence, should control the jury, but if there be any well-established circumstances in the case' which may reasonably be regarded as incompatible with the theory of the defense that the killing was justifiable, then the jury, from a consideration of all the evidence, is warranted in finding that the act amounted to an unlawful homicide.

[3] ID.—DIRECTION OF GUNSHOT WOUND — RELATIVE POSITION OF PARTIES—OPINION EVIDENCE—PREJUDICIAL ERROR.—The question whether the direction of a gunshot wound in the body of a deceased indicates the relative positions of the person firing the shot and the person receiving it is not a matter of expert or opinion evidence; and in this prosecution for murder, in which the defendant pleaded self-defense, and in which the question of the sufficiency of the evidence, as a matter of law, to support the verdict was a close one, it was prejudicial error to permit the county autopsy surgeon, who was not a witness to the shooting, to testify as to the relative positions of the parties when defendant fired the fatal shots.

[4] ID.—ERROR—APPEAL—REVIEW OF EVIDENCE.—While section 4½ of article VI of the constitution confers upon the appellate court the power to weigh, to a limited extent, the entire evidence upon which a conviction was had, that court is not substituted for the jury and cannot determine, as an original inquiry, the question of defendant's guilt or innocence, but must decide whether any error committed has led to the verdict which was reached; and whenever that court is unable to determine whether the defendant would have been convicted had erroneously admitted testimony been withheld from the jury's consideration, that section of the constitution cannot be applied to uphold the judgment.

---

(1) 30 C. J., p. 145, sec. 354.   (2) 16 C. J., p. 635, sec. 1263; 30 C. J., p. 307, sec. 553.   (3) 16 C. J., p. 747, sec. 1532; 17 C. J., p. 332, sec. 3674.   (4) 17 C. J., p. 368, sec. 3751.

APPEAL from a judgment of the Superior Court of Los Angeles County. Carlos S. Hardy, Judge. Reversed.

The facts are stated in the opinion of the court.

Wm. T. Aggeler, Public Defender, and Charles E. R. Fulcher, Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and John L. Flynn for Respondent.

FINLAYSON, P. J.—Upon an information charging him with the murder of Ignacio Gonzales, defendant was convicted of manslaughter, and now appeals from the judgment and from an order denying him a new trial.

Defendant, who in the trial court admitted the killing but claimed that it was done in necessary self-defense, claims here that the evidence is insufficient to justify the verdict. The salient facts in the case are these: Decedent lived with his wife and family in a house located about a block and a half from the scene of the tragedy, which occurred near the intersection of Gabriel and Effie Streets, in the city of Los Angeles. Some time prior to the homicide the deceased had had illicit relations with Manuela Gonzales, a married woman who had separated from her husband and who seems to have been the cause of the jealousy which led to the deadly encounter. Though the woman and decedent bore the same surname, they were not related either by consanguinity or affinity. An illegitimate child was the result of their meretricious relations. Manuela Gonzales lived with her father at 1758 Gabriel Street, about a half block north of Effie Street. Defendant worked at El Segundo, in Los Angeles County. He had a brother whose residence was about two or three blocks from the home of Manuela Gonzales.

On the afternoon of July 7, 1923, defendant left El Segundo for Los Angeles, arriving in the latter city in the evening at about forty minutes past 6 o'clock. He went to a grocery store kept by one Jose Martinez, situated one block east of the spot where the killing took place. After purchasing some bread he left the store, accompanied by the decedent. Following the exchange of a few words, the nature of which will presently be stated, the two men separated, defendant proceeding to the home of Manuela Gonzales, to whom he was engaged to be married. He remained there about thirty minutes, talking to Manuela and her father. About a month previously defendant had purchased the pistol with which the shooting was done. It had been left by him at the house of Manuela Gonzales for the purpose, so he claimed, of affording protection to the house against burglars or other possible intruders. On the evening in question, before leaving Manuela's house, defendant procured the pistol from the woman, and some time between

8 and 9 o'clock he left the house with the intention, so he
says, of calling upon his brother, who, as we have stated,
lived near by. Proceeding southerly on the easterly side of
Gabriel Street, defendant, on arriving at or near the north-
east corner of Effie and Gabriel Streets, saw the deceased,
who, according to defendant, was standing on the opposite
corner. The night was dark; there were no street lights,
and, with the exception of the two participants, there were
no eye-witnesses to the shooting. Defendant fired five shots,
three of which took effect.

Two of the bullets entered the front of the body and one
entered near the anterior aspect of the left shoulder. Dr.
A. F. Wagner, the county autopsy surgeon, who examined
the body two days after the homicide, called as a witness for
the prosecution, testified that he found three bullet wounds
in the body of the decedent. These he described as follows:
One bullet entered an inch above the left nipple and about
three-quarters of an inch from its outer side. It passed
backward and slightly inward and downward through the
second rib, the inner margin of the left lung, the upper
posterior of the left ventricle of the heart and through the
fourth rib near its attachment to the spine, finally lodging
just beneath the skin in the midline of the back, about three
inches lower than the level of its entrance. Another bullet
entered the outer surface of the left shoulder near the
anterior aspect. It passed inward and downward in front
of the bone, out in the armpit, and, entering the chest in
the inner side of the armpit, it proceeded downward and
through the soft tissues of the left thoracic wall, grazing
the adjacent margin of the lung. It perforated the dia-
phragm, penetrated the inner margin of the spine and the
left end of the stomach, tore a large hole in this part
of the stomach, and, passing through the abdominal
wall in the back near the spine, lodged just beneath the
skin in the back, at a point two inches to the left of the
midline and about three inches below where the first-men-
tioned bullet was found. Another entered just to the right
of the navel, passed toward the right through the abdominal
muscles and slightly downward, struck the crest of the
ilium or hip bone, where it lodged, lying just beneath the
skin at about the anterior superior spine of the hip bone.
The witness further testified that the general course of all
the bullets was downward; that the course of one was ap-

proximately from left to right, and that the courses of the other two were also from left to right, but not in the same degree; that death was caused by the gunshot wounds in the heart and abdomen, and that a bullet through the heart usually produces instant death.

Immediately after the shooting defendant proceeded one block easterly to the grocery store of Jose Martinez, arriving there about five minutes after the occurrence. Laying his pistol on the counter, he told the proprietor that he had shot a man, exhibited to the grocer a swelling on his left wrist, such as might be caused by a blow from a club or stick, and asked Martinez to call the police. The latter complied with the request. The call was received at the police station about 9 o'clock. Defendant remained in the store until the arrival of the police, fifteen minutes later, when he told the officers that he had shot Gonzales after the latter had attacked him with a club.

There are no curbs or sidewalks on either Gabriel or Effie Street. When the officers examined the surroundings where the killing occurred they found the body lying about ten or fifteen feet north of the northerly line of Effie Street. Its distance from the east line of Gabriel Street was variously estimated by the several witnesses. The body was found lying on its right side, with the right hand extended above the head. A club or stick about two feet long, three and a half inches in circumference and of hard wood was found lying parallel with the body, about two or three feet from the right hand and in line with the body. One of the officers testified that the stick, which he described as resembling a piece of hoe handle, looked as if it had dropped out of the decedent's hand as he fell. On arriving at the police station the officers found on defendant's left wrist a bruise about two inches long, an inch wide and swollen to about half an inch.

All of the witnesses but one testified that the spot where the body lay was east of the center line of Gabriel Street. One of the officers testified that it lay west of the center line of that street—that it lay about twenty feet from a fence on the west side of the street. Another officer testified that the body was found lying on the east side of the street, between the center line of Gabriel Street and the east curb line. Still another officer testified that it lay about one foot

west of where the easterly curb would have been had there been a curb or sidewalk. The grocer, Jose Martinez, testifying as a witness for the people, said that the body was lying on the east side of Gabriel Street—the side of the street on which the house of Manuela Gonzales was—and about eight feet from a fence on the east side of the street. Whether the body when found was lying on the east or west side of Gabriel Street is a material factor in the case, as later will appear.

The evidence for the prosecution consisted of the testimony of the county autopsy surgeon, who described the nature of the wounds found on the body and gave his opinion as to the relative positions of the parties when the shots were fired; the testimony of decedent's wife to the effect that her husband left their home at about 7 o'clock in the evening, that she did not see him carrying any stick or club when he left, and that about an hour later she heard the fatal shots; the testimony of the grocer and the officers as to the statements made to them by the defendant, the condition of the body when found and how it lay; the testimony of an interpreter who interpreted for the officers the statements which were made to them in Spanish by the defendant; the testimony of Manuela Gonzales as to what transpired that evening when defendant called upon her just prior to the shooting; a written statement, in Spanish, which the defendant wrote and gave to the officers, and an English translation thereof. This statement, or rather the translation, is set forth *infra*. It tends to show that the killing was done in self-defense. Except as to the precise spot where the shooting occurred—and it unquestionably occurred where the body was found, for without doubt the decedent fell as the five shots were fired—defendant's testimony is not materially contradicted by the testimony of any of the witnesses for the people.

Defendant was a witness on his own behalf. The case presented by his testimony is substantially as follows: After purchasing bread of Jose Martinez he left the grocery store with the intention of calling upon Manuela Gonzales. Decedent, who happened to be in the store at the time, left when defendant did. As the two walked from the building decedent asked defendant where he was going. Defendant replied that he was going to the house of Manuela Gonzales.

Whereupon decedent told defendant that if he went to the woman's home he, decedent, would "beat him up." Defendant told decedent that he could not do that, and that he, defendant, was going over to Manuela's house. Nothing further was said and the two men parted, decedent taking a direction which led toward his own home and defendant proceeding to the house of Manuela Gonzales, where he remained for about half an hour. Before taking leave of Manuela he asked the woman for the pistol which he previously had left with her. He told Manuela that decedent had threatened to "beat him up," and that he wanted the pistol in order to defend himself in the event that he should be attacked. She gave him the weapon and shortly thereafter he left, telling Manuela that he was going to his brother's house. He proceeded southerly on Gabriel Street toward Effie Street, walking on the easterly side of Gabriel Street—on the part where the easterly sidewalk would have been had there been any sidewalk. As he approached the northeast corner of the crossing formed by the intersection of Gabriel and Effie Streets he saw Ingacio Gonzales standing on the northwest corner. From this point defendant's testimony, reduced to narrative form, is substantially as follows: Gonzales asked me to go with him to the park. I told him I would not go—that I was going to my brother's house. Then he came after me right away. I was backing up, and he came after me, trying to strike me. He struck me, struck at me two or three times. He struck at me twice, at my hat, along each side of my head, and then, acting in my own defense, I pulled the gun from my pocket. He continued to strike at me. He struck me on the wrist, just about the wrist of my left hand. When he struck me I was backing up. When I shot we were almost together—right close together. The encounter occurred on the east side of Gabriel Street near the crossing. When he first spoke to me I was on one corner and he was on the other. When I told him I would not go to the park with him he came over to the corner where I was. He came at me right away. When he came after me and began to strike me I began to back and back. I fired all five shots in succession as fast as I could shoot. He was striking at me and I was shooting. His body fell where I shot him. He did not fall until the last shot. I do not know which shots hit him.

When he fell his body was about four or five steps inward from the corner on the east side of the street. I was backing up toward Manuela's home. When I began backing I was about two feet from where the curb of the sidewalk should be on the east side of the street. I was jumping backward. I did not say anything when he struck me. He came right after me. It was very dark. I could not see what he had in his hand. I thought it was a large piece of iron or a stick or a knife. I didn't know what it was, and I had to defend myself with what I had. I was afraid he would kill me or do me great bodily injury. It appeared to me that he was about to kill me. When I shot him I was in front of him. I pointed the gun at him because he was right in front of me. I shot neither to his right nor to his left. I just shot. After I shot Gonzales I walked to Mr. Martinez' grocery store and told him to notify the police.

The English translation of the written statement which defendant gave to the police officers, and which the prosecution put in evidence as a part of its case, is as follows: "Well, I arrived from the camp and went straight into the store; I bought the bread, I met the man and greeted him and told him I was going to the house of Manuela, and I went straight to the house, arrived there and greeted her and all her family and remained there in conversation for about one-half hour. I then asked her for the gun and then she said that if she gave it to me her father would scold her. Well, but if this man wants to strike me, what have I got to face him? Well, I think he is going to beat me and I cannot face him with my finger-nails merely. I left the house, and the first thing I found was him at the corner, and he invited me to fight and I told him that I did not want to and then he came after me, endeavoring to strike me and I began to back up and when I saw he was going to strike me on the head, then I pulled the gun and began shooting, and I discharged all of the five shots and I then went to the store to tell that I did not want to be a criminal."

Dr. Wagner, over defendant's strenuous objections, was permitted to testify that in his opinion, based entirely upon the result of his examination of the body and the course taken by the bullets, the man who did the shooting was in front and toward the left of the decedent. Asked by

the district attorney if, from his examination of the body
and the course of the bullets, he could tell in what position
the decedent was when he was shot, the witness replied:
"In a general way I could. I can positively state that the
man [who did the shooting] was in front and toward the
left. He was not immediately in front, but what we might
call diagonal toward the left and in front of the deceased."

Appellant, as his first point, urges with much earnestness
that, upon all the evidence, but one conclusion can be drawn,
and that is that it was only in the necessary defense of
his own person that he killed Gonzales.

[1] The jury could not have found, from the evidence
for the people, that the killing was done by appellant ex-
cept upon the latter's admissions, which carried, in close
and immediate connection with proof of the killing, circum-
stances of necessary self-defense. Since, therefore, the proof
on the part of the prosecution tends to show that the act of
appellant was justifiable, there was, at the close of the peo-
ple's case, no presumption against the accused that he had
committed an unlawful homicide. No presumption of guilt
weighed against the presumption of innocence. "Upon a
trial for murder, the commission of the homicide by the
defendant being proved, the burden of proving circum-
stances of mitigation, or that justify or excuse it, devolves
upon him, *unless the proof on the part of the prosecution
tends to show that the crime committed only amounts to
manslaughter, or that the defendant was justifiable or ex-
cusable."* (Pen. Code, sec. 1105.)

[2] But it does not necessarily follow that appellant's
account of the killing, though uncontradicted by direct evi-
dence, should control the jury. If there be any well-estab-
lished circumstance in the case which may reasonably be
regarded as incompatible with the theory of the defense
that the killing was justifiable, then the jury, from a con-
sideration of all the evidence, was warranted in finding that
the act amounted to an unlawful homicide. The question
therefore is: Does the record furnish evidence of any cir-
cumstance which cannot reasonably be reconciled with the
theory that appellant acted in self-defense? Though a
majority of the people's witnesses agree that the spot where
the body was found is east of the center line of Gabriel
Street, and though one of the officers even testified that the

body was found quite near where the easterly curb line would be, the jury nevertheless would be justified in accepting as true the evidence of the officer who testified that it was found west of the center line of the street. And if, as the witness last referred to testified, the body was found west of the center line of Gabriel Street and about twenty feet from a fence on the westerly side of the street, then that is approximately where the shooting occurred, for the five shots were fired in a volley or in rapid succession, as though by the convulsive hand of an hysterical person wrought to a pitch of excitement, and one bullet passed through the upper posterior of the left ventricle of the heart. Indeed, appellant himself admitted at the trial that the deceased fell as the last shot was fired. If, then, the shooting did occur west of the center line of the street, it may be argued that there thus is afforded some ground for the inference that appellant, seeing Ignacio Gonzales on the opposite corner, and inflamed with a rage born of jealousy, advanced and sought a quarrel, with the design of forcing a deadly issue so as to create a real or apparent necessity for the killing. But we doubt if such an inference can be said to rest upon any very substantial foundation. The finding of the body on the west side of the street, if indeed that is where it was found, does not seem to amount to anything more than a circumstance which raises only a suspicion of guilt. As an incriminating circumstance it seems to be equally compatible with innocence. Appellant testified that while he was shooting he was "jumping backward." It is not an unreasonable inference that on this dark night appellant, in the excitement of the moment and while "jumping backward," lost all sense of direction, and that though he supposed he was backing up on the east side of the street he was in fact jumping backward in a diagonal direction, and took more jumps backward than he thought he did. This hypothesis—an hypothesis which, when we pause to consider the nervous excitement engendered by the heat of a deadly encounter, is not an unreasonable one— would account for the fact, if it be a fact, that the body fell, with the last shot, on the west side of the street instead of on the east side, as appellant supposed, or, rather, as he testified. It has been said by our supreme court that where "every circumstance relied on as incriminating is

equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court." (*People* v. *Staples,* 149 Cal. 425 [86 Pac. 894].)   **[3]**   At any rate, if it cannot be said, as a matter of law, that the evidence in this case is insufficient to support the verdict, the question is a close one—so close that it may readily be seen how appellant must have been greatly prejudiced by the action of the court in permitting the county autopsy surgeon to give his opinion as to the position in which appellant stood when he fired the fatal shots.   And this leads us to a consideration of what we deem to be a fatal error in the case and the ground upon which we are satisfied the judgment should be reversed.

That grievous error was committed when Dr. Wagner was permitted to testify that he could "positively state" that the man who did the shooting was in front "and toward the left," that "he was *not immediately* in front, but what we might call *diagonal towards the left* and in front of deceased," is clearly demonstrable.   The question whether the direction of a gunshot wound in the body of a deceased indicates the relative positions of the person firing the shot and the person receiving it is not a matter of expert or opinion evidence, and it has been held by our supreme court that it is error to allow a physician to testify to his opinion upon that question.   (*People* v. *Milner,* 122 Cal. 171 [54 Pac. 833] ; *People* v. *Westlake,* 62 Cal. 303 ; *People* v. *Smith,* 93 Cal. 445 [29 Pac. 64].)   There are other factors besides the course of the bullets in the body which must be looked to in order to determine the relative positions of appellant and decedent when the shots were fired.   Indeed, the slightest consideration of the facts of this case will suffice to show that the question of the relative positions of appellant and Gonzales during the shooting was not one which an expert or any other person could determine merely from the course of the bullets, but was essentially a question for the jury, and for the jury only, to be determined by it from a careful consideration and weighing of all the evidence.   For example, if decedent, at the instant when the shot was fired which entered near the anterior aspect of his left shoulder, was striking at appellant with a piece of wood which was found at the scene of the tragedy, then it is not improbable

that the former, in order to deliver an effective blow, raised his right arm, advanced his left foot and partially turned upon his waist-line in such a manner as to swing the right side of the upper portion of his body backward, thus presenting his left shoulder toward appellant just as the shot was fired. If this supposition be true, and it is not inherently improbable, then the fact that the bullet entered near the anterior aspect of the left shoulder would not conflict with appellant's statement that he was directly in front of the deceased and was backing away as he fired the shots. Or it may be that the first shot which struck the deceased was the one which entered just to the right of the navel. We can readily perceive how the impact of a bullet so received might force the right side of the person thus shot to turn with a backward movement and in such a manner as to bring his left shoulder in line with a pistol held directly forward by a person standing immediately in front of him. These illustrations will suffice to show that neither a physician nor any other person could tell the relative positions of the parties merely from the course of the bullets. And yet Dr. Wagner presumed to say, and over defendant's objection was permitted to testify, that he could *positively* state that the man who did the shooting was not immediately in front of the decedent but was "what we might call diagonal toward the left." The fact that to this description the witness added the words "and in front of the deceased" did not cure the error. It still remains that the doctor claimed that, as an expert, he could positively state that the person who fired the shots was not *immediately in front* of the deceased.

That the appellant's position during the shooting in its relation to that of the decedent is an element of prime importance in the case admits of no doubt. For if, as appellant testified, he was directly in front of the deceased as he fired the shots, then the position of the parties harmonizes with appellant's testimony that he was "backing up" or "jumping backward" when he fired the fatal shots. On the other hand, if he stood somewhat to the left of the deceased when the shots were fired that fact might lend color to the theory that appellant was advancing upon Ignacio Gonzales from a point of vantage of his own choosing and that he was the aggressor—that instead of receiving the

attack from the deceased on or near the northeast corner of the crossing, he himself, when he espied Gonzales on the opposite side of Gabriel Street, sought out the quarrel and closed in on his victim.

[4] While it is true that section 4½ of article VI of the constitution confers upon this court the power to weigh, to a limited extent, the entire evidence upon which a conviction was had, still ''we are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence.'' We are to ''decide whether, in our judgment, any error committed *has led* to the verdict which was reached.'' (*People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042].) (Italics ours.) And whenever we are unable to determine whether the defendant would have been convicted had erroneously admitted testimony been withheld from the jury's consideration, this section of the constitution cannot be applied to uphold the judgment. (*People* v. *MacPhee,* 26 Cal. App. 218 [146 Pac. 522]. See, also, *People* v. *Columbus,* 49 Cal. App. 763 [194 Pac. 288], *Freeman* v. *Adams,* 63 Cal. App. 225 [218 Pac. 600], and *People* v. *Roe,* 189 Cal. 548 [209 Pac. 560].) After a most careful consideration of the entire cause, including the evidence, we are unable to determine whether the jury would or would not have convicted appellant had Dr. Wagner's opinion as to the position of the parties been withheld from them. This being so, we do not think that the judgment can be upheld by reason of this provision of the constitution.

The judgment and the order denying a new trial are reversed.

Works, J., and Craig, J., concurred.