[Crim. No. 320.   Fourth Appellate District.—March 30, 1936.]

THE PEOPLE, Respondent, v. EDWARD R. TABER, Appellant.

Burke & Herron for Appellant.

U. S. Webb, Attorney-General, Warner I. Praul, Deputy Attorney-General, W. F. Menton, District Attorney, and Preston Turner, Deputy District Attorney, for Respondent.

BARNARD, P. J.—The defendants were charged with conspiring to burn an apartment house owned by the defendant Taber and occupied by the defendant Sibley, with the intent to prejudice and defraud an insurance company which had insured the building. In a second count they were charged with arson, in intentionally setting fire to and burning this building. In the fall of 1932 one Eli and one Rose had been convicted of arson in connection with the burning of this building, as a result of which they were confined in the penitentiary. The defendant Taber was convicted by a jury and has appealed from the judgment and from an order denying a motion for a new trial.

It is conceded that the appellant and his wife were the owners of the building which was insured for $4,000; that in March, 1932, the house was partially prepared for burning by Eli but was not ignited; that there was a fire in the building on April 23, 1932, as a result of which the appellant collected

$285 on the insurance policy; that the building was destroyed by fire on June 7, 1932, as a result of which the insurance company paid the appellant $2,000; that both of these fires were incendiary in nature; and that at the time of both fires the apartment house was occupied by Rose and by Sibley.

Rose testified that in the fall of 1931 he rented the building from Taber with the understanding that each was to have half the profits therefrom and that Rose should remove the building from the property by the first of the year, and should have the same for the work of removing it; that about the first of March, 1932, at Taber's office in Los Angeles, he and Taber agreed that he was to burn the building and that Taber was to pay him half of the insurance collected; that he arranged with Eli to assist in burning the building for half of his share of the proceeds; that a week or two later he returned to the house and found that Eli had made preparations for a fire but had not lighted it; that a few days later he arranged with Sibley to burn the building and it was agreed that the money to be received from Taber should be divided between the other three; that on April 23d Sibley poured gasoline and set fire to the building but the fire was put out by the fire department with only a slight damage to the building; that shortly after this fire Taber told him that his insurance had been canceled but that he could go ahead with the burning after the insurance was straightened out; that two or three weeks later Taber came to the apartment house and told him it was all right to proceed when he felt safe; that he repeated this to Eli and Sibley, and Sibley agreed to make another effort to burn the building; that shortly after the building was burned, on June 7, 1932, Eli reported that fact to him and the two went to Los Angeles where he told Taber that the building had been burned; and that Taber said it would be four or five days before the insurance would be straightened out. He then testified that he went to see Taber several times and each time Taber told him that he had not yet settled with the insurance company; that on each of these occasions Taber gave him some money, usually $5 or $10, but once $50 and once $100; that on one of these occasions Taber agreed to get him out on bond in the event he was arrested; that after he was arrested an attorney named Bush came to the jail to see him and represented him

throughout his trial; that he had not theretofore known Bush; and that he did not hire him or pay him.

It is first contended that there was no legal corroboration and that aside from the testimony of the accomplices, Rose and Eli, the evidence is insufficient to connect or tend to connect the appellant with the conspiracy or with the arson. The rules governing such corroboration are well settled. In *People* v. *Negra,* 208 Cal. 64 [280 Pac. 354], the general rules are thus set forth:

"While the jury may consider the circumstance that a witness is an accomplice, in passing upon his credibility as a witness (*People* v. *Clough,* 73 Cal. 348, 354 [15 Pac. 5]), his testimony is not to be rejected merely because he is an accomplice, and if there is other evidence which measures up to the requirement of the code (*supra*), tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, as is any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. (*People* v. *Hoosier,* 24 Cal. App. 746 [142 Pac. 514].) The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. (*People* v. *McLean,* 84 Cal. 480 [24 Pac. 32].) The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accomplice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. (*People* v. *Martin,* 19 Cal. App. 295 [125 Pac. 919].) The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. (*People* v. *Armstrong,* 114 Cal. 570 [46 Pac. 611]; *People* v. *Sullivan,* 144 Cal. 471, 473 [77 Pac. 1000].) It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged. (*People* v. *Solomon,* 6 Cal. Unrep. 305 [58 Pac. 55].) It is not necessary to cite the great number of authorities which sustain these fundamental

principles of law relating to the testimony of an accomplice. An examination of the decisions will show that the evidence in each case must be considered in the light of these rules, applied to its particular facts, and a determination reached accordingly.''

While the appellant denied having had anything to do with the burning of this building he admitted that he rented the property to Rose, that Rose came to see him on these various occasions, and that after the first fire he gave Rose $50 which he said Rose was to use in repairing the building. It is not disputed that the appellant owned the building and that he had insured it. It fully appears that he increased the insurance from $3,000 to $4,000 the last time it was insured, in August, 1930, and that although the building was totally destroyed he accepted $2,285 from the insurance company. From this and from the fact that the appellant had agreed that Rose should remove the building from the premises it would appear that the building was overinsured. The appellant was notified by the fire department of the two previous attempts to burn the building and, without making any attempt to investigate the matter, permitted Rose and Eli to remain in the building. He hired and paid an attorney to defend Rose on a charge of burning the property, and furnished money to Rose's wife while he was in jail. While the appellant would benefit from any insurance money collected no satisfactory motive for burning the building appears on the part of Rose and Eli, in the absence of some such arrangement as that testified to by them. The appellant made a number of conflicting and contradictory statements about these matters. At the trial of this action he testified that he visited the premises about the first of May, 1932, while at the trial of Rose and Eli he testified that he had not been near the property during that time. This also furnishes some support for Rose's testimony that Taber came to the building about that time and told him that his insurance had been straightened out and that they were to proceed with the plan. The appellant further testified that the last time he insured the house he had cut the insurance from $6,000 to $4,000. The insurance agent who wrote the insurance testified that on that occasion the insurance was increased from $3,000 to $4,000. When the appellant was arrested he stated to the officers that he had not hired the attorney, Bush, to defend

Rose in the former action in 1932, that he hardly knew him and that he had not paid him any money for defending Rose. He testified here that he employed Bush to defend Rose in the other action, that he paid him $260 for his services, and the check with which he paid him was admitted in evidence. The mother of Rose testified that shortly after Rose was arrested she told the appellant that if her son was guilty of arson he was equally guilty, and that the appellant made no denial. A woman who owned an adjoining building testified that before the first of these fires she had a talk with the appellant, at which time he asked her ''Why couldn't we have a fire?'' While the appellant denied having paid money to Rose after the fire, with the exception of the $50 which he said was for repairs, he confirmed the testimony of Rose's wife and mother to the effect that they visited him several times after the second fire and that on each occasion he gave them some money, these amounts totaling $50 or more. The record is very voluminous and we have not attempted to summarize all of it. In our opinion, there is ample corroboration of the testimony of the accomplices, under the established rules, and the evidence is sufficient to sustain the judgment.

The appellant contends that the court erred in restricting the cross-examination of the accomplice Rose as to the motives which actuated him in testifying. It had been brought out that this witness had been convicted and was serving a term in the penitentiary, and that his term had been fixed by the prison board. While he was being cross-examined he was asked whether he entertained a hope that he would be given some leniency if he came down and testified in this case for the People. To this question he replied: ''I had no arrangement with the district attorney.'' He was then asked: ''Q. You had no hope in your heart that you would be given an early parole or your sentence otherwise shortened because of your appearance here?'' An objection to this question was sustained, the court holding that he might be questioned only as to what promises had been made to him. The appellant argues that he had the right to cross-examine this witness on his state of mind, and relies upon the case of *People* v. *Pantages,* 212 Cal. 237 [297 Pac. 890]. In that case the court said that it was entirely proper, either by cross-examination or otherwise, to show a belief or even

a hope on the part of a witness that he might secure immunity or a lighter sentence in return for his testimony, and that the long delaying of sentence after a plea of guilty is evidence tending to show the existence of such a hope. In the instant case, the witness in question had already been sentenced and his term fixed by the prison board. Even his time of parole after serving of sentence was fixed and there would not seem to have been much basis for a hope of obtaining leniency. There was no offer of proof and nothing to show that any answer to the question would have been favorable to the appellant. However the question might have been answered, any hope for leniency must have been based upon an inference from other facts. These facts were before the jury and could be used as a basis for arguing to the jury that the witness must have had such a hope. The appellant had the right to so argue anyway and probably did as the district attorney seems to have answered such an argument. There is no showing of prejudice and, even if error be assumed it would not appear to have been sufficiently prejudicial to justify a reversal.

It is next contended that the court erred in refusing to permit two witnesses for the appellant to answer certain questions as to conversations they had with him, and in refusing to permit the appellant to answer certain questions asked of him. The essence of these assignments is that the court erred in refusing to permit the appellant to prove, by his own testimony and that of other witnesses, his reasons for hiring an attorney to defend Rose in the former action, for paying this attorney and for giving various amounts of money to Rose's mother and wife while Rose was in jail. The appellant had testified that Rose had threatened that in the event of his arrest he would implicate the appellant unless the appellant furnished him a lawyer, furnished bail and took care of his family. The appellant offered to prove that he talked this matter over with his office associates and with his regular attorney, and that this attorney advised him that he ought to underwrite Bush's fee for defending Rose to the end that Rose would have an honest lawyer who would not frame him, whereas if Rose did not have the money to employ an honest lawyer he might get a shyster who would do so, and that he acted upon this advice. He also offered to prove that he gave small sums to Rose's mother and wife because of

Rose's threat to wrongfully implicate him, and also because he felt sympathy for Mrs. Rose and the children.

The prosecution introduced evidence to the effect that the appellant had employed Bush to represent Rose who was charged with burning this building and that he had given money to Rose's wife after Rose was arrested. This evidence was introduced for the purpose of corroborating the testimony of Rose and of connecting the appellant with the conspiracy and the arson. The prosecution placed great emphasis upon this evidence as showing that these acts were done by the appellant for the purpose of inducing Rose to remain silent as to his connection with the affair. The rejected evidence above referred to was offered for the purpose of showing what was actually in the appellant's mind and what were his reasons for doing these acts. While the appellant was prevented from explaining these things, upon the objection of the district attorney, it was repeatedly argued to the jury that these acts had not been and could not be explained. The following quotations from the argument indicate how the matter was stressed:

"If Mr. Taber is as innocent as he would have you believe, if he was being blackmailed, as he would have you believe, why should he not go to the district attorney of this county, or the district attorney of Los Angeles county, or some police department, for protection? Instead of that, he hires a lawyer to defend the man who burns this building, and I challenge them to satisfactorily explain that circumstance, especially in view of the incriminating circumstances which are in the record here. Without investigation, without anything, he takes his word for it; he knows nothing about it, except that John Rose told him, and he hires a lawyer to come down here and defend him.

"If someone burned your building down, would you hire a lawyer to defend him, . . . and then expect the jury to believe that the reason you did that was because he was blackmailing you? Or would any reasonable person, instead, go to the district attorney and lay the facts before him and ask for protection?"

" . . . You people are all intelligent but do you believe for one moment that if the defendant Taber had all of these witnesses to the fact that he was being blackmailed, that he would hire a lawyer to defend the man who burned his

building for protection, instead of going to the district attorney and asking for protection where it could be given and would he wait three years before saying anything about it, if it actually happened?

"Assume that one of you people owned a building in Huntington Beach . . . and it burned down . . . and then . . . when the finger of suspicion was pointing at some individual in the community, and the officers were investigating that man, would you be giving him a little money before he was put in jail, and then when he was placed in custody and the charges filed against him for burning your property, is it the act of an innocent person to finance this man's defense?

"And why then, in the face of accusations of this kind, did he go ahead and do the very thing that would implicate him, namely, hiring a lawyer, . . . ?"

The general rule is thus given in Jones on Evidence, second edition, section 170:

"It is the prevailing rule, sustained by the great weight of authority, that whenever the motive, intention or belief of a person is relevant to the issue it is competent for such person to testify directly upon that point, whether he is a party to the suit or not."

In *People* v. *Moore,* 48 Cal. App. 245 [191 Pac. 980], the court said:

"An objection was sustained to the following question asked the defendant: 'Did you intend, Mr. Moore, at the time when you got these cattle from Mr. Edmands to cheat or defraud Mr. W. O. Edmands or W. H. Edmands out of those cattle or any of them?' We think this question was proper and that the defendant should have been allowed to answer it. 'The general rule is well settled that, under our system, a witness may be examined as to the intent with which he did a certain act, when that intent is a material thing in the action.' "

In *Fleet* v. *Tichenor,* 156 Cal. 343 [104 Pac. 458, 34 L. R. A. (N. S.) 323], the court used this language:

"The general rule is well settled that, under our system, a witness may be examined as to the intent with which he did a certain act, where that intent is a material thing in the action. A jury or trial judge is not bound, of course, to believe the witness when he says he did not have a certain intent, but may find in the circumstances, actions, and lan-

guage. an entirely different intent, but the testimony of the witness 'is competent and relevant and not immaterial'."

The matter here in question went directly to the motive of the appellant in doing certain acts which were particularly relied upon by the prosecution as corroborating the testimony of the accomplices. These acts were emphasized in the argument to the jury as furnishing such corroboration and it was argued, in effect, that they had not been explained and could not be explained, and the appellant was challenged to explain them although his explanation had been shut out on the objection of the district attorney. So far as the jury knew, no attempt had been made to explain these circumstances and while the district attorney was free to draw inferences from the absence of an explanation, the appellant was deprived of the basis for any argument that his explanation was valid and that he had a good reason for acting as he did. In our opinion the exclusion of the offered testimony was erroneous, under the circumstances shown by the record.

The question remains whether this error was sufficiently prejudicial to justify a reversal in view of the provisions of section 4½ of article VI of the Constitution. In *People* v. *O'Bryan*, 165 Cal. 55 [130 Pac. 1042], the court said:

"On the other hand, we do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. When we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is or is not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected."

In *People* v. *Salaz*, 66 Cal. App. 173 [225 Pac. 777], the court said:

"While it is true that section 4½ of article VI of the Constitution confers upon this court the power to weigh, to a limited extent, the entire evidence upon which a conviction was had, still 'we are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence.' We are to 'decide whether,

in our judgment, any error committed *has led* to the verdict which was reached.' (*People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042].) (Italics ours.) And whenever we are unable to determine whether the defendant would have been convicted had erroneously admitted testimony been withheld from the jury's consideration, this section of the Constitution cannot be applied to uphold the judgment.''

In *Tupman* v. *Haberkern,* 208 Cal. 256 [280 Pac. 970], the court said:

''Whether the error found to be present 'has resulted in a miscarriage of justice' presents a question of law on the record before the court, and the purpose of the section was to require the court to declare as matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies.''

In *People* v. *Davis,* 210 Cal. 540 [293 Pac. 32], the court said:

'' 'And even if it be assumed that the so-called corroborative testimony is technically sufficient to prove the asking, agreeing to receive and receiving a bribe from Ed Rosenberg, nevertheless it leaves the case in that weak and unsatisfactory condition in which errors become important, because in such case they much more easily lead to a miscarriage of justice than in those cases where there is abundance of reliable evidence of the defendant's guilt. Section 4½ of article VI of the Constitution was not intended to mean that the mere fact that the evidence may legally be able to stand up under the weight of the judgment is sufficient reason in all cases for refusing to set aside the judgment. The phrase ''miscarriage of justice'', used as descriptive of that condition of a cause which justifies the reversal of a judgment, has no hard and fast definition. It seems assured, however, that where errors have been committed, and where the appellate court finds that upon the record it is seriously doubtful that without such errors the defendant would have been convicted, then it may well be that errors which otherwise would not be considered to be seriously prejudicial, will require a reversal.' ''

The jury would naturally feel, especially in view of the argument made, that the hiring and paying of a lawyer to defend Rose in the former action and the giving of money to

Rose's family while he was in jail would strongly tend to show the appellant's connection with the fires, which were admittedly incendiary, and it seems extremely probable that these facts materially contributed to his conviction. As the case went to the jury it had no knowledge of any explanation on the part of the appellant as to why he had done these things. If the jury had heard his explanation of these matters and believed the same, they might have entertained a reasonable doubt as to one necessary element, that is, whether the testimony of the accomplices had been sufficiently corroborated. It is entirely possible that the jury might have acquitted the appellant but for the exclusion of this testimony and, under such circumstances, the error is necessarily prejudicial. (See *People* v. *Smith,* 206 Cal. 235 [273 Pac. 789].) We cannot tell whether or not the jury would have accepted the appellant's explanation had it been submitted to them but its exclusion directly affected the most important evidence against him, evidence which could well have been controlling in the case and which was strongly emphasized by the district attorney in his argument. The appellant's explanation was that he had done these things under a threat of blackmail and to guard against the carrying out of a threat to frame him. Many an innocent man has yielded to blackmail. While we cannot know whether the jury would have accepted this explanation as sufficient, the excluded evidence would have added a substantial item to the balance in the appellant's favor and it is entirely possible that its admission might have changed the verdict. Under such circumstances it cannot now be positively asserted that "the result was just, and that it would have been reached if the error had not been committed." (See *People* v. *Estorga,* 206 Cal. 81 [273 Pac. 575]; *People* v. *Barrett,* 207 Cal. 47 [276 Pac. 1003]; *People* v. *Wilson,* 23 Cal. App. 513 [138 Pac. 971].) In our opinion, the appellant should have been permitted to explain the most damaging evidence which had been produced against him. Since he was prevented from doing this and the absence of such an explanation was especially urged to the jury as a reason for his conviction, the ends of justice require that he be given a new trial.

The last two points raised by the appellant require no consideration. The first of these is without merit and the sec-

ond, if not entirely corrected by the court's ruling, will undoubtedly not be repeated on a second trial.

The judgment and order are each reversed and the cause remanded for a new trial.

Marks, J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 27, 1936.