[Civ. No. 1776. Fourth Appellate District.—June 8, 1936.]

SARAH ADRIAN et al., Minors, etc., Respondents, v. ELBERT RAY GUYETTE et al., Appellants.

W. H. Stammer and Galen McKnight for Appellants.

Edmond A. Chevalier and Rae B. Carter for Respondents.

MARKS, J.—This is an appeal from a judgment rendered in favor of plaintiffs against Elbert Ray Guyette, A. E. Guyette, Alice C. Guyette, whom we will refer to as the defendants, and Allen Remy who did not appeal. The action grew out of a collision in which four automobiles were involved, in the intersection of East Avenue and Eleventh Street in the city of Reedley at about noon on Sunday, March 5, 1935. The day was clear and the streets were dry.

East Avenue runs north and south, and Eleventh Street runs from northeast to southwest. For convenience we will assume it runs east and west. Eleventh Street has a paved strip in its center twenty feet in width with oiled shoulders six feet wide. The intersection is not an obstructed one as defined in section 113 of the California Vehicle Act in force at the time of the accident.

Elbert Ray Guyette and Allen Remy were both minors. The automobile was driven by Elbert, with the consent of his father, the owner, who with Alice C. Guyette, his mother, had signed Elbert's application for an operator's license. These facts occasion the liability of Mr. and Mrs. Guyette.

Defendants state the following questions involved in this appeal: '' (1) Are appellants responsible for respondents' injuries when their automobile never collided with that of respondents, or with any automobile that did collide with that of respondents, and when appellants never came within 20 feet of the collision, or affected the operation of the colliding automobiles in any way? (2) Was counsel for respondents guilty of prejudicial misconduct in examining the jury and

did the trial court err in refusing a mistrial? (3) Does the evidence sustain the judgment against appellants? (4) Did the trial court erroneously admit evidence over appellants' objections? (5) Did the trial court erroneously deny appellants' motion to strike evidence from the record? (6) Did the trial court erroneously instruct the jury?'' The first and third questions are directed at the sufficiency of the evidence to sustain the judgment and will be considered together.

At about noon on Sunday, March 5, 1935, plaintiffs, the minor daughters of B. P. Adrian, were riding with him in his automobile which was proceeding east on Eleventh Street. As they approached the East Avenue intersection from the west an automobile driven by Mrs. Margaret Chadwick approached and entered the intersection from the east. This automobile was followed by two others, the first driven by Allen Remy, and the second by Elbert Ray Guyette. Mrs. Chadwick entered the intersection at a very slow speed and either stopped, or practically stopped, near its center, in order to permit the Adrian car to pass, before making a left turn. Adrian saw the Chadwick car and the two automobiles following it. As the latter were traveling rapidly he turned his car to his right and off the pavement onto the shoulder of the highway in order to permit the other automobiles to pass between it and the Chadwick car in a clear space which was probably at least ten feet wide. Upon seeing that the Chadwick car was about to stop Remy turned onto the left side of the pavement and crashed into the Adrian automobile. When the Remy car turned to its left young Guyette for the first time saw the Chadwick automobile stopping in front of him. He turned to his right and the left front fender and perhaps the hub cap of the left front wheel of his automobile came into contact with the left rear of the Chadwick car. The Guyette car came to rest at the northwest corner of the intersection. It was never closer than twenty feet to the Adrian car and did not come into contact with it.

It is defendants' theory that the negligence of Mrs. Chadwick in failing to give a proper signal of her intention to slow down or to stop in the intersection was the proximate cause of the accident as Remy and young Guyette had to avoid crashing into her car as best they could and could not be blamed for the courses they followed in the sudden

emergency. They argue that young Guyette did not know of the presence of the Chadwick car on the road in front of him until the Remy automobile had turned to its left and cleared his line of vision; that he was confronted with a sudden emergency and chose the only rational course open to him, namely, turning to his right as the balance of the road was occupied by the other cars; that the evidence shows no negligence on his part; that if he were guilty of any negligence it was neither a proximate nor a concurring cause of the collision between the Remy and Adrian cars; that as the Guyette car did not come within twenty feet of the Adrian car and as it did not affect the operation of the Remy car the judgment against defendants cannot be supported under any reasonable hypothesis.

Plaintiffs present quite a different theory of the cause of the accident. They argue that Remy and young Guyette raced west on Eleventh Street driving their cars side by side at a speed of fifty or more miles an hour; that when they realized that Mrs. Chadwick was about to make a left turn or stop they both applied their brakes, Remy turning to his left and Guyette to his right in an endeavor to go around the Chadwick car; that in passing, the left front of the Guyette car struck the right rear fender and wheel of the Remy automobile, throwing it out of control and into the Adrian car.

The argument that the two automobiles were racing side by side depends on the testimony of Harriett McCracken and Roy Toreson.

Mrs. McCracken lived on the north side of Eleventh Street east of East Avenue. She was in the living room of her home and saw the two cars as they passed an open door and window of that room. She testified they were proceeding side by side. She at no time saw them closer than 327 feet to the point of the collision.

Roy Toreson saw the two cars when they were about 300 feet east of the point of impact. He testified that they "were going neck and neck". By this expression it is evident that he referred to the speed of the two cars because he immediately explained it as follows: "Yes, one going and the other one following right behind, very close," and, "they were right back of one another . . . It was right back of one another."

It is thoroughly established by all the evidence in the record that the Remy and the Guyette cars were not traveling side by side for the last 300 feet before the collision. Both drivers and other witnesses so testified. The Remy car left a skidmark on the pavement seventy feet long. It led to the right rear wheel of that car. The Guyette car left a skidmark 132 feet long which led to its left wheel. The Guyette skidmark commenced 62 feet east of the one caused by the Remy car. The two skidmarks were parallel for about 40 feet and between 3 and 4 feet apart. The skidmark made by the Remy car was at the right of the other. This would indicate that the right of the Guyette car was closer to its right-hand edge of the pavement than the right of the Remy car instead of being on its left and attempting to pass it as urged by plaintiffs.

The right rear fender of the Remy car was bent inward, the hub of the right rear wheel was bruised and one or more of the wire spokes were broken from the hub at the point of the bruise. It is evident that this damage was caused by the wheel and fender coming into sharp contact with some other object. It is not suggested that the Remy car came into contact with the Chadwick car or that its rear came into contact with the Adrian automobile. As there were only four cars in the proximity of the accident this leaves only the Guyette car which could have caused the damage. Its left front hub cap was missing, but it is admitted that the left front of that car came into contact with the right rear of the Chadwick automobile.

Both Remy and young Guyette testified positively that their two cars did not come into contact. In this they were supported by the testimony of a passenger in the Remy car. However, it is not suggested that the damage to the wheel and fender of the Remy car was caused at a prior time. It was not caused by either the Chadwick or Adrian automobiles which leaves the Guyette car as the sole remaining probable cause. From this the jury might draw the inference that the Guyette automobile came into contact with the rear of the Remy car when the paths of the two cars crossed.

The testimony of Remy given at the trial, that the two cars did not come into contact, was impeached by a statement which he made shortly after the accident, when he told a wit-

ness, "There was room enough but Guyette's car struck my car and I lost control over my car."

Defendants urge that from the appearance of the injury to the right rear fender and wheel of the Remy car the damage was caused by another automobile traveling in the same direction or converging on its course; that as the courses of the Remy and Guyette cars were diverging the damage could not have been caused by the latter car. This is a strong argument to have addressed to a jury. As that body evidently rejected it, we cannot disturb its implied finding on a question of fact, although we might consider that the greater probabilities were in favor of the correctness of the defendants' contention.

Defendants point to evidence to the effect that a Mrs. Jack Ward drove her automobile past the Remy car after the accident and in so doing brushed its right rear fender. From this they urge that the injuries to the right rear fender and wheel of the Remy car were caused by Mrs. Ward's car. A witness for plaintiffs testified that the fender was bent and the wheel bruised before Mrs. Ward's car passed.

After carefully studying the evidence we have reached the conclusion that it is sufficient to support the implied finding of the jury that young Guyette did not have his car under proper control, and did, at the time of the accident, drive it at a speed greater than was "reasonable and proper, having due regard to the traffic, surface and width of the highway" (subd. a, sec. 113, California Vehicle Act), and that his negligence concurring with the negligence of Remy was a proximate cause of the accident and injury of plaintiffs. (*Smith* v. *Schwartz, ante,* p. 160 [57 Pac. (2d) 1386].)

Defendants urge that counsel for plaintiffs committed prejudicial error in their examination of prospective jurors and that the trial judge erred in refusing a motion for mistrial because of such error.

Counsel for plaintiffs were allowed considerable latitude in their examination of jurors on their possible interest in or connection with insurance companies. We do not understand that counsel for defendants maintain there was any misconduct in any of these questions asked. The alleged misconduct is based on the following: "Mr. Carter: I'd like to address this question to all of you in the jury box. Now, dur-

ing the course of the trial it may develop, incidentally, that certain of the attorneys representing parties to this action, represent business firms or organizations locally. I want to ask if there is any member in the jury box now, anyone in the jury box now who is an employee of the Southern Pacific corporation? (No response.) Mr. Carter: Thank you. That is all. Mr. Stammer: If the Court please, I'd like to assign that remark of counsel as error, prejudicial to the rights of this defendant and I ask the Court in view of that situation and the obvious intent of that question, to declare a mistrial in this action. . . . The Court: All those who were in the box previously are now in their places. The Court will deny the motion for mistrial asked by Mr. Stammer but does instruct the jury to disregard the last question that was asked—the last two questions that were asked, and to draw no inference at all from the asking of the question. You may proceed. Mr. Stammer: In order that there may be no question about it, if the Court please, we would like to note a specific exception to the Court's ruling.''

The quoted question asked by counsel for plaintiffs was improper. The Southern Pacific corporation had no possible connection with the case and it was unnecessary to bring its name into it. This was recognized by the trial judge when he instructed the jurors to disregard the question. While we are of the opinion the question should not have been asked, we are at a loss to discover prejudice in it, especially in view of the admonition to disregard it. We cannot see why the intimation that counsel for defendants might ''represent business firms or organizations locally'', or even the ''Southern Pacific corporation'', could prejudice the rights of defendants in the eyes of the jurors. The mere fact that a busy and able practicing attorney might have been employed in his professional capacity to represent business interests, large or small, should not of itself cast aspersions upon him or prejudice the cause of other clients whom he might represent.

■ Defendants' next assignments of error revolve around the question of whether or not the portion of Eleventh Street which was the scene of the accident was within or without a ''residence district'' as defined by subdivision ''b'' of section 28½ of the California Vehicle Act in effect at the time of the accident. This subdivision provided as follows: ''A 'residence district' for the purpose of this act shall mean the

territory contiguous to a public highway, not comprising a business district as herein defined, when the property on one side of said highway for a distance of at least a quarter of a mile is occupied by thirteen or more separate dwelling houses or business structures, or where the property fronting on both sides collectively of said highway for at least a quarter of a mile is occupied by sixteen or more separate dwelling houses or business structures.''

On this phase of the case counsel direct their arguments to two questions: (1) Were there sixteen or more separate dwelling houses or business structures on the property fronting on both sides of Eleventh Street for a quarter of a mile which included the scene of the accident? (2) Was the scene of the accident properly sign-posted as required by section 116 of the California Vehicle Act? The conclusions we have reached on the first make consideration of the second unnecessary. The answer to the first question rests upon the construction to be placed on the phrase ''where the property fronting on both sides collectively of said highway for at least a quarter of a mile . . . '' We must determine when property *fronts* on a highway, and, where it is bounded by three public streets, whether it fronts on one or more of them.

The evidence on the question is not in conflict. It is admitted that there were fifteen separate dwellings or business houses fronting on the quarter of a mile of Eleventh Street in question here. The problem is presented by the question of the frontage of a ''lot twelve'' which was occupied by a single dwelling and a garage. The map on which this lot appears, plaintiffs' exhibit number five, is a photograph of a portion of an official map of the city of Reedley upon which no directions appear. Further, the names of the streets with which we are concerned here are omitted. There appear on it several lots bearing the number ''twelve''. If we have correctly oriented this map with plaintiffs' exhibit five and understand it in connection with the evidence of the witnesses, the lot twelve in question is bounded on the east by East Avenue and on the south by North Avenue with its southeast corner cut off by Eleventh Street. It is a large lot and while neither a scale nor the dimensions of the lot appear on the map, from dimensions of other lots we estimate its east and west dimension at about three hundred feet and its north and south dimension at several hundred feet. It

is contiguous to North Avenue for about one hundred fifty feet, to Eleventh Street for about one hundred seventy feet, and to East Avenue for several hundred feet. It is occupied by a single dwelling and a garage. The front door of the dwelling opens towards North Avenue, with which it is connected by a walk. The garage also opens towards North Avenue and is connected with it by a driveway. A wire fence is built along the Eleventh Street side of the lot. It is clear that the dwelling and garage front on North Avenue and not on Eleventh Street or East Avenue.

It should be observed that subdivision ''b'' of section 28½ of the California Vehicle Act concerns itself with three requirements which must be met in order to constitute a residence district. We need not concern ourselves with one of these for it is admitted that there were not ''at least thirteen separate dwelling houses or business structures'' on one side of Eleventh Street within a distance of one-quarter of a mile. First, we have the reference to the territory ''contiguous to a public highway''. There is no doubt that this means the territory with its land lying along and adjoining a public highway. Next, the parcels of land *fronting* on both sides of a highway must have standing upon them not less than sixteen dwellings or business structures within a distance of one-quarter of a mile.

The word ''property'' in its broad sense includes that which is subject to ownership by one to the exclusion of others. (Secs. 654, 655, Civ. Code.) Of course, it is apparent that the legislature could not have intended to give it any such broad meaning when used in section 28½ of the California Vehicle Act. It is evident that what was in the legislative mind was equivalent to the more restricted use of the words ''real property'' which includes the land and the buildings and other fixtures erected upon it. It is evident from the section that the occupancy of the land is the determining factor in fixing the character of the district. The required number of buildings used for business purposes in a given distance is sufficient for the establishment of a ''business district''. The same is true of ''separate dwelling houses or business structures'' in establishing a ''residence district''. It follows that the use and occupancy of the territory contiguous to a public highway is the determining factor in fixing the nature of the district. It is only important

that the land exclusive of the improvements be contiguous to the highway. It is important that the "property", the land and the buildings, *front* on the highway.

It is clear that a building fronts on a highway when its principal means of ingress and egress with the connecting walks lead to that highway. May it be said that a property, the land and buildings, front on more than one highway? Of course, this might be true where a building had more than one principal entrance. It would also be true where there were several buildings on one parcel of land, the principal entrances of which were approached from different highways. But where there is a single structure on a lot with but one principal entrance to but one of two contiguous highways, can the property be said to front on both highways?

The rules governing the construction of statutes in cases of this kind are well summarized in 23 California Jurisprudence, page 763, as follows: "In construing a statute of doubtful meaning, the probable intent of the legislature may be ascertained from the attending circumstances, that is, the occasion and necessity for the enactment. The court may look behind the law itself to discover its true meaning from the motive or reason which inspired the enactment,—from the object in view and purpose, as well as the evils sought to be remedied. The court will keep in view the subject-matter of the law, as well as its scope. And if the language is vague or susceptible of a more or less extensive sense, an intention in accordance with reason and equity is to be presumed, and for that purpose it is necessary to pay attention to the nature of the subject to which the statute relates. In so doing a court may take judicial notice of the evils preceding the enactment of a statute, and of the mischiefs intended to be prevented thereby, the character and importance of the interests which may be affected thereby, and the usual course of business. Every statute and code section should be construed with reference to its purpose and the objects intended to be accomplished by it. The language will be so interpreted, if possible, as to aid the design and intent of the legislature, and to effectuate the evident objects and purposes of the law."

It is clear from the provisions of the California Vehicle Act that the legislature intended to impose upon motorists the duty of traveling at a low rate of speed in districts devoted

principally to business where considerable congestion of vehicular traffic and pedestrians is to be expected. A slightly higher rate of speed was intended in populous residence districts. Thus it appears that the motivating impulse of the legislature was to provide for the safety of the traveling and pedestrian public and of children at play.

This being true, it should follow that the legislature imposed restrictions on the speed of vehicular traffic in order to promote the safety of those entering and leaving structures built on property abutting on highways. There can be no business or residence district without buildings on property abutting on a highway. The safety of those entering or leaving those buildings was one concern of the legislature in enacting speed regulations. Therefore, the frontage of the buildings and the use made of the structures erected on the land should determine the frontage of the entire property.

In the instant case there was but one dwelling on lot twelve with its single entrance from North Avenue. As the property in question consisted of both the land and the buildings, the use made of the property and the established entrance to the building should determine the front. It follows that the property fronted on North Avenue and not on Eleventh Street. This left but fifteen ''separate dwelling houses or business structures'' on the one-quarter of a mile of Eleventh Street with which we are concerned which was an insufficient number to constitute a ''residence district''.

At plaintiffs' request the trial judge read to the jury portions of sections 28½, 113 and 116 of the California Vehicle Act. By these instructions there were submitted to the jury for its consideration the questions, (1) whether the portion of Eleventh Street in question was a residence district, and (2) the permissible speed of young Guyette before such speed would become *prima facie* negligence, depending upon the jurors' conclusion of whether the portion of the street was within or without a residence district.

As we have seen, there was an entire lack of any conflict in the evidence as to the number of separate dwelling houses or business structures fronting on this portion of Eleventh Street. It follows that there was no issue of fact on this question to be submitted to or decided by the jury. The question was solely one of law addressed to the trial judge and to be decided by him. In cases of this kind where there

is no conflict in the evidence upon which the determination of a question of law rests the decision is for the court and it should not be submitted to the jury. (*Vicino* v. *Amador,* 71 Cal. App. 604 [236 Pac. 369]; *Gayton* v. *Pacific Fruit Express Co.,* 127 Cal. App. 50 [15 Pac. (2d) 217].) It follows that the trial court committed error when these questions were submitted to the jury for decision.

■ Having reached the conclusion that there was error in the instructions given to the jury, the sole remaining question necessary for our decision is whether or not, under the provisions of section 4½ of article VI of the Constitution, such error was sufficiently prejudicial to require a reversal of the judgment.

In the recent case of *People* v. *Taber,* 13 Cal. App. (2d) 27 [55 Pac. (2d) 1189], this court had occasion to review numerous cases on the effect of that constitutional provision on errors committed in the trial of a case. It was there said: "In *People* v. *Salaz,* 66 Cal. App. 173 [225 Pac. 777], the court said: 'While it is true that section 4½ of Article VI of the Constitution confers upon this court the power to weigh, to a limited extent, the entire evidence upon which a conviction was had, still "we are not substituted for the jury. We are not to determine, as an original inquiry, the question of defendant's guilt or innocence". We are to "decide whether, in our judgment, any error committed *has led* to the verdict which was reached". (*People* v. *O'Bryan,* 165 Cal. 55 [130 Pac. 1042].) (Italics ours.) And whenever we are unable to determine whether the defendant would have been convicted had erroneously admitted testimony been withheld from the jury's consideration, this section of the Constitution cannot be applied to uphold the judgment.' In *Tupman* v. *Haberkern,* 208 Cal. 256 [280 Pac. 970], the court said: 'Whether the error found to be present "has resulted in a miscarriage of justice" presents a question of law on the record before the court, and the purpose of the section was to require the court to declare as matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies.' "

In the instant case the evidence was conflicting on the speed at which young Guyette was proceeding west on

Eleventh Street just prior to the accident. It was variously estimated at between about thirty-five and fifty miles an hour. According to his own testimony, if he were driving in a residence district he was guilty of *prima facie* negligence in driving faster than twenty-five miles an hour and the jury might have concluded that he was actually guilty of negligence *per se*. (Sec. 113, subsec. 7, subd. b, and subd. d, California Vehicle Act.) As he was driving outside a business or residence district this result could not have followed unless the jury concluded that his speed was in excess of forty-five miles an hour. The majority of the witnesses placed his speed at the latter figure or less. The verdict of the jury might easily have been based on the erroneous assumption that the portion of Eleventh Street was in a residence district and that the speed of from thirty-five to forty miles an hour, which young Guyette admitted, was negligence *per se* which was in itself sufficient to make him responsible for the injuries to plaintiffs. Under these circumstances we regard the instructions to which we have referred as prejudicially erroneous requiring reversal of the judgment.

Defendants moved for a judgment notwithstanding the verdict and have appealed from the order denying that motion. We believe the case should be tried again and for that reason that order should be affirmed.

The order denying defendants' motion for judgment notwithstanding the verdict is affirmed. The judgment against Elbert Ray Guyette, A. E. Guyette and Alice C. Guyette is reversed.

Barnard, P. J., and Jennings, J., concurred.