[Crim. No. 5922.   In Bank.   Mar. 1, 1957.]

THE PEOPLE Respondent, v. THOMAS L. JOHNSTON, Appellant.

Robert A. Zarick, C. K. Curtright and Leo R. Friedman for Appellant.

Edmund G. Brown, Attorney General, Doris H. Maier, Deputy Attorney General, and J. Francis O'Shea, District Attorney (Sacramento), for Respondent.

SCHAUER, J.—Defendant appeals (Pen. Code, § 1239, par. (b)) from a judgment pursuant to a jury verdict which found him guilty of murder in the first degree and expressly fixed the penalty at death, and from an order denying his motion for new trial. He contends that the evidence shows only murder of the second degree and that this court should reduce the degree (Pen. Code, § 1260), or, in the alternative, that if the evidence be considered sufficient to show murder of the first degree then claimed prejudicial errors in the exclusion of evidence, comments of the trial judge, and the giving and refusal of instructions as to state of mind require reversal. The entire record clearly shows the intelligently accomplished purpose of court and all counsel to accord defendant a completely fair trial. On such a record our review can lead only to affirmance.

On the afternoon of February 5, 1956, defendant (an apprentice embalmer 24 years of age) was in a motion picture theater. He saw his victim (a boy 7 years of age) leave the theater through an aisle opposite the aisle near which defendant was sitting. Defendant, leaving his jacket on the seat beside him, went to the men's room. There he heard in a booth sounds which seemed to be made by a small person. Defendant had a knife in his pocket. He decided to wait for this person to emerge from the booth and "If this person was . . . small enough where I thought I could handle him, take and cut this person, for the purpose of scaring him." Defendant took the knife from his pocket. When the child emerged from the booth defendant "grabbed him around the mouth and carried him" into another booth, shut the door, and cut the boy superficially under the right eye "To scare him and get his reaction to what it would be." (The testimony of the autopsy surgeon shows that the child was cut superficially under both eyes.) The boy screamed and "to quiet him down, I cut his throat on the right side." The assistant manager of the theater, having heard the scream, rushed into the rest room. The child "slipped from my grasp, and it was almost immediately after that, practically simultaneously, that I cut his throat on the left side." Defendant started to leave the booth and saw the assistant manager. When the assistant manager saw the defendant, knife still in hand, he ran from the restroom. Defendant then went to the lobby. There he was detained by the assistant manager and manager until the police arrived in answer to a telephone call and took defendant into custody.

The foregoing account of the killing is taken primarily from defendant's testimony at the trial. It is materially the same as defendant's statements to a deputy district attorney shortly after the killing and to another deputy district attorney on February 6, the day after the killing.

Defendant was examined by Dr. Toller at the request of the prosecution, by Dr. Kelley, Dr. Miller, and Dr. Rapaport, appointed by the court (defendant had entered a plea of not guilty by reason of insanity [see Pen. Code, § 1027] but withdrew it during the course of trial), and by Dr. Catton for the defense. Each of these psychiatrists testified. Dr. Catton, the first psychiatrist to take the stand, testified, "I believe that at the time of the commission of this act with which he stands charged that there was serious interference with certain aspects of the processes of deliberation, premeditation and the things leading up to and including the formation of intent to kill"; the other psychiatrists testified that in their opinions defendant, on the day of the killing, had capacity to deliberate and premeditate and to form the specific intent to kill. Each psychiatrist gave the reasons for his opinion.

Defendant urges that his undisputed testimony and statements to the deputy district attorneys show that no sufficient interval for deliberation and premeditation elapsed between the time that he cut the boy slightly, with no purpose to kill, and the time that he cut the boy's throat to silence his screams. The jury, however, could disbelieve the evidence that defendant's original purpose as he waited for the boy with open knife was merely to cut him slightly, and could believe, from other evidence, that defendant's purpose was a lustful intent to kill. And there was evidence upon which the jury could predicate a determination that this intent was formed willfully, deliberately, and after premeditation.

Portions of defendant's testimony and his statements to the deputy district attorneys are to the following effect: Defendant saw the boy leave the theater. Defendant almost immediately thereafter left the theater, looked about the lobby and saw that the boy was not there, concluded that the boy had gone to the men's room, and himself went to the men's room. From the sounds which defendant then heard, he concluded that the boy was in the booth. The jury were not required to believe defendant's testimony that he decided to cut the boy slightly when defendant heard him in the booth; they could determine that defendant followed the boy from the theater to the men's room with the

formed purpose of cutting him fatally. According to one of defendant's statements to a deputy district attorney defendant left his seat in the theater "about half a minute or so, maybe more," after he saw the boy walk down the aisle, and in response to the question "Did you expect to see him in the toilet?" answered "Yes, I expected to."

It is defendant's position that, despite the foregoing extra-judicial statements and the testimony of defendant, the People are bound by portions of the extrajudicial statements of defendant, introduced in evidence by the People, such as the following: Defendant cut the boy "Mainly to see what would happen, I guess . . . to see what the reaction would be.

"Question: When did it enter your mind to do that? Answer: After I had gone into the head. . . .

"Question: Tell me, did the little boy have anything to do with your going to the restroom? Answer: No. . . . I would have gone up anyway if he hadn't gone out . . . I thought to grab this kid as he came out and my original intention was to just cut him a little bit and scare him but——

"Question: (Interposing) Any reason for that? Answer: No. . . . [O]ther than just scare him was my original intention. Then I got panicky and killed him."

Defendant urges that "where the prosecution introduces evidence favorable to the accused and does not controvert such evidence, the prosecution is bound by such uncontradicted evidence" (citing *People* v. *Coppla* (1950), 100 Cal.App.2d 766, 769 [224 P.2d 828]; *People* v. *Toledo* (1948), 85 Cal.App.2d 577, 581 [193 P.2d 953]). But here the statements of defendant presented by the People were not all uncontradicted evidence in his favor. Rather, the very statements of defendant on which defendant now relies contained, among other evidence, evidence on which, as already indicated, the jury could predicate a determination (based on the evidence in the case as a whole, rather than the isolated statements of defendant which he contends show lack of deliberation and premeditation) that defendant followed his victim from the theater with a formulated intent to injure him fatally.

Defendant urges that comments of the trial judge concerning the three court-appointed psychiatrists prejudiced defendant by informing the jury that these three experts were vouched for by the judge, that one of them had been produced at the trial at inconvenience to the expert, and that their testimony was entitled to great credence. The circumstances

in which this claimed prejudicial error occurred were as follows:

Before defendant called Dr. Catton to the stand, defense counsel examined defendant's father as to events in defendant's life which, according to defense theory, would tend to show, with the aid of expert testimony, that defendant was unable to entertain "malice aforethought" or to form a willful, deliberate, and premeditated intent to kill. The trial judge said, "None of us have any control of what a psychiatrist may base his opinion on but I feel that if this evidence is being admitted I must keep this Jury mindful of the fact that you undoubtedly will hear from an expert . . . [T]he Court has appointed three experts in this case that are available to counsel at any time they want them, they will be here tomorrow morning—— . . . [T]hese experts can take into consideration the testimony that is introduced here with regard to the certain parts of the history of this defendant, and here is what the purpose of it is: Duly qualified— I will give you this instruction now and I will give it to you again at the end of the trial—they may give their opinions on questions in controversy at a trial. . . . [T]he first question apparently that is in question at the present time in this case is the question as to whether or not this defendant premeditated and deliberated and formulated the intent to kill before the homicide was committed or at the time of the homicide. Now, as I say duly qualified experts may give their opinion on . . . questions in controversy at a trial and I have before stated . . . the chief question that is before you now. Now, to assist the Jury in deciding such questions the Jury may consider the opinion with the reasons stated therefor if any by the expert who gives the opinion. The Jury is not bound to accept the opinion of any expert as conclusive. They should give to it the weight to which they shall find it to be entitled. The Jury may, however, disregard any such opinion if it should be found by them to be unreasonable."

After Dr. Catton had testified, and while defendant was putting on other parts of his case, Dr. Kelley entered the courtroom. The trial judge read to the jury a portion of section 1027 of the Penal Code (appointment of alienists when defendant pleads not guilty by reason of insanity), and said, "of course, the question of legal insanity is not questioned in this trial, but the question of the state of mind is, and I have appointed as the alienists in this case Dr. Walter Rapa-

port, Superintendent of the Department of Mental Hygiene of the State of California and Dr. Kelley who is an instructor in psychiatry at the University of California I understand, and Dr. Theodore Miller who is the Medical Superintendent of the Hospital at Napa, the State Hospital there. . . ."

The judge asked Dr. Kelley the following questions which he answered affirmatively: "realizing that I brought you here from some distance, it is your desire to testify now instead of later, is that it? . . . it would interfere with your program if you do not now testify? . . . you came here at my special suggestion to be here today?"

The judge said to counsel, "I am not going to put him on myself. I am submitting him to you gentlemen if you want to put him on." Defense counsel said, "I have not had an opportunity to discuss with Dr. Kelley his . . . examination, and I . . . never put a witness on the stand without first discussing what his testimony is." The prosecuting attorney said, "I am going to put him on if there is any question about it. . . . I haven't talked to Dr. Kelley either as to what his testimony is. . . . [But] I want to put him on."

The judge in the exercise of his power to control the order of proof (Code Civ. Proc., § 2042) then permitted the prosecuting attorney to produce Dr. Kelley as a witness for the People.

Defense counsel completed his presentation of defendant's case, rested, and the People in rebuttal presented Dr. Toller, Dr. Miller, and Dr. Rapaport.

In support of his contention that the trial judge, by his comments and conduct above described, in effect warranted the testimony of the three court-appointed psychiatrists, defendant relies upon such statements as that in *People* v. *Choynski* (1892), 95 Cal. 640, 643-644 [30 P. 791] (quoted from *People* v. *Williams* (1860), 17 Cal. 142, 147; accord, *People* v. *Conboy* (1910), 15 Cal.App. 97, 101 [113 P. 703]): "The experience of every lawyer shows the readiness with which a jury frequently catch at intimations of the court, and the great deference which they pay to the opinions and suggestions of the presiding judge, especially in a closely balanced case, when they can thus shift the responsibility of a decision of the issue from themselves to the court . . . A judge cannot be too cautious in a criminal trial in avoiding all interference with the conclusions of the jury upon the facts."

Defendant argues, further, that the asserted overemphasis

of the trial judge on the credence which should be given the court-appointed psychiatrists was not corrected by the following instructions:

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. . . .

"You are not bound to decide in conformity with declarations of any number of witnesses, which do not produce conviction in your minds, against a less number or . . . other evidence satisfying your minds. . . .

"You are the exclusive judges of the weight, value and effect of the evidence and of the credibility of the witnesses. . . ."

Defendant relies upon the following proposition quoted in *People* v. *Mason* (1946), 72 Cal.App.2d 699, 711 [165 P.2d 481]: "General statements in the charge to the effect that the jury are at liberty to disregard the court's views as to the defendant's guilt or innocence, and to base their verdict on their own conclusions from the evidence, do not cure the fault in the charge of a lack of impartiality in submitting the evidence to the jury, or justify the court in making one-sided recitals of evidence, or in furnishing arguments in behalf of only one side of issues, as to which the evidence is conflicting."

There can be no quarrel with the above quoted propositions relied on by defendant. ▇ But here the trial judge did not in any respect interfere with the jury's determination of the facts. He simply stated that three psychiatrists had been appointed by the court, and that Dr. Kelley, at the judge's request, had come from some distance. It does not appear that these statements could have been understood by the jury as an indication that the testimony of the court-appointed doctors was entitled to special credence or was to be weighed by any rules other than those quoted above as applicable to all witnesses alike. ▇ As a practical matter the fact as to whether an expert witness has been called by a party or appointed by the court will almost inevitably appear in the course of direct or cross-examination, if not by the mere

order of interrogation by counsel. That such fact may be considered by the jury in weighing the testimony of an expert is inherent in the law of evidence.

██ Defendant contends that the trial judge erroneously excluded from evidence photographs of defendant taken one or two hours after the killing. Defendant's employer testified, concerning these pictures, that from them it appeared to him that defendant was nervous and excited. He also testified that "The photographs are not normal"; this latter statement was stricken on motion of the prosecution. As defendant says, evidence relevant to his state of mind at the time of the killing was crucial; however, it does not appear that the jury could have drawn pertinent inferences as to defendant's state of mind at the time of the killing from photographs of him taken an hour or two thereafter. Certainly exclusion of the photographs was not prejudicial error. (Cal. Const., art. VI, § 4½.)

Defendant contends that instructions of the trial judge during the course of the trial gave the jury a wrong conception of their duty as to determining whether defendant killed willfully, deliberately, and after premeditation; that such instructions emphasized assertedly erroneous portions of the formal instructions and confused the jury as to correct portions of the formal instructions.

The formal instructions include adaptations of sections 187 through 189 of the Penal Code (the legislative definition of murder). ██ The jury were then told that it is only as to the "wilfully, deliberate and premeditated killings mentioned in the statute . . . that any difficulty is experienced in drawing the distinction between murder of the first and second degree, and this difficulty is more apparent than real." Defendant understandably criticizes the last quoted clause of the instruction; the law may now be clear but the application of it to varying circumstances often presents difficult questions; however, it does not appear that telling the jury that "this difficulty is more apparent than real" was prejudicial error.

The formal instructions on the subject of murder continue:

"The unlawful killing must be accompanied with and be preceded by a deliberate and clear intent to take life in order to constitute murder of the first degree and such intent to kill must be the result of deliberate premeditation. It must be formed upon a preexisting reflection and not upon

a sudden heat of passion or provocation or other circumstance sufficient to preclude deliberation and premeditation. It is necessary that the act of killing be preceded by and the result of a concurrence of will, deliberation and premeditation on the part of the slayer and if such is the case, the killing is murder of the first degree.

"Neither the statute nor the courts have undertaken to measure in units of time, the length of time during which the thought must be pondered before it can ripen into an intent which is truly deliberate and premeditated. The time would vary with different individuals and under different circumstances. The true test is not the duration of time as much as it is whether or not there has been reflection and the formation of a deliberate premeditated and preconceived intent to kill, prior to the killing. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree.

"The word 'deliberate' referred to in these instructions has been defined as follows: 'Formed, arrived at or determined upon; a result of careful thought and weighing of considerations carried on coolly and steadily, especially according to a preconceived design.' The word 'deliberation' has been defined to mean 'careful consideration and examination of the reasons for and against a choice or measure.'

"The word 'premeditate' as used in these instructions means 'think on and revolve in the mind beforehand; to contrive and design previously.'

"The deliberation and premeditation above referred to and which is essential to sustain the verdict of murder in the first degree must precede formation of the intent to kill, and such intent must be a result of and based upon such deliberation and premeditation.

"Murder in the second degree may be defined, for the purpose of this case, as the unlawful killing of a human being intentionally with malice aforethought and without the deliberation, premeditation and preconceived intent to kill essential to the crime of murder in the first degree, as the terms have been defined to you. Murder in the second degree also includes the unlawful killing of a human being with malice aforethought in the perpetration of or attempt to perpetrate any

felony other than those mentioned in the definition of murder of the first degree, which I have given you.''

''You are instructed that an essential element of murder by means of lying in wait is that the person lying in wait must do so with the intent to commit acts which are likely to cause death and which show a conscious disregard of human life. If the defendant lay in wait merely to inflict bodily harm not likely to cause death, with no conscious disregard of human life, it is insufficient to convict the defendant of first degree murder on the theory of lying in wait.

''However, if the defendant lay in wait with intent to commit acts likely to cause death and which showed a conscious disregard of human life, in the commission of murder, the crime would be murder of the first degree.''

''Murder which is perpetrated by means of torture is declared by the law to be murder of the first degree, and if you shall find that the defendant committed that crime, you will have no choice but to designate the offense as murder in the first degree. An essential element of murder by torture is that the acts of torture must be the cause of death of the victim. Another essential element of murder by torture is that the person who committed the acts, which caused another human being to suffer pain and to die, does so with the intent that such other person shall suffer pain from those acts. Therefore if you shall find that the defendant committed the acts of torture with the intent to cause the deceased to suffer pain, but that such acts of torture themselves were not the cause of death, the evidence would be insufficient to convict the defendant of murder on the theory of torture.''

The foregoing formal instructions, in general substance, embody the essential principles enunciated in *People* v. *Holt* (1944), 25 Cal.2d 59, 83-87 [153 P.2d 21] ; *People* v. *Thomas* (1945), 25 Cal.2d 880, 901, 903 [156 P.2d 7] ; *People* v. *Bender* (1945), 27 Cal.2d 164, 177, 179 [163 P.2d 8] ; *People* v. *Valentine* (1946), 28 Cal.2d 121, 131-132, 134-135 [169 P.2d 1] ; *People* v. *Tubby* (1949), 34 Cal.2d 72, 76-78 [207 P.2d 51] ; and *People* v. *Carmen* (1951), 36 Cal.2d 768, 777 [228 P.2d 281] ; see also *People* v. *Daugherty* (1953), 40 Cal.2d 876, 901-902 [256 P.2d 911].

The following instructions given from time to time during the course of the testimony, although undesirable in possibly seeming to intimate that at the ''very time of the killing'' the defendant might then ''formulate the deliberate

intent to kill," do not, when considered with the correct formal instructions, appear prejudicial:[1]

"The mental state that you are concerned with in this case is that mental capacity at the time of the commission of the homicide to deliberate on the part of the defendant; to premeditate, deliberate and formulate a deliberate intent to kill . . ., with malice aforethought. Now, the mental state is material as it existed at the very time of the killing. This evidence is admitted—this last evidence—but any evidence pertaining as to mental state is only for you to consider as it affects . . . the ability of the defendant to deliberate and to formulate the deliberate intent to kill. This is admitted for the purpose of your answering the question in your own minds and in your verdict, did he, at the time of the killing, formulate the deliberate intent to kill, and then kill."

"Now, ladies and gentlemen of the jury, you are the ones who determine whether or not he did formulate the intent to kill. The Doctor has testified that he had the capacity to do it, but you are the ones to determine whether or not he did do it. So you will absolutely disregard his answer to the question, 'Did you form an opinion as to whether he actually did formulate an intent to kill, or could you tell that?' The Court instructs you that you will not consider that question nor the answer thereto. You yourselves must determine the question as to whether or not he formulated the intent to kill."

■ Defendant complains also that the judge improperly emphasized his assertedly erroneous exclusion of competent evidence of defendant's relevant state of mind by the instruction that "you will not consider that question ["Did you form an opinion as to whether he actually did formulate an intent to kill . . .?"] nor the answer thereto ["My opinion was that he did form an intent to kill"]." The ruling of the trial judge apparently was based on his determination that the expert should not testify to an ultimate issue of fact. While there is in this state no absolute rule that an expert cannot so testify (*People* v. *Cole* (1956), 47 Cal.2d 99, 105 [301 P.2d 854] ; *People* v. *Martinez* (1952), 38 Cal.2d 556, 564 [241 P.2d 224] ; *People* v. *Wilson* (1944), 25 Cal.2d 341, 349

---

[1]In this connection it is to be noted that defense counsel did not argue to the jury that the killing was only manslaughter, nor does he seriously present such an argument on appeal; he did not request instructions as to manslaughter; and it does not appear that the evidence could reasonably be construed as showing the crime of manslaughter in the usual legal significance of that term.

[153 P.2d 720]), no prejudice to defendant appears from the judge's refusal to allow the psychiatrists to give direct opinions as to whether defendant did in fact form the relevant state of mind.

■ As defendant points out, it is apparent from the record that during the trial the judge and counsel had in mind the proposition, stated in *People* v. *Wells* (1949), 33 Cal.2d 330, 347 [202 P.2d 53], that "at the trial upon a not guilty plea evidence, competent in character, which tends to show that a defendant, at the time he committed the overt act, either possessed or did not possess the specific essential mental state (as of malice aforethought, deliberate intent, etc.) is admissible," except that evidence as to legal sanity or insanity is not admissible under our system of bifurcated trial. But nothing appears in the conduct of the prosecution or of the trial judge which could, upon any theory urged, have prejudiced defendant in connection with this proposition.

■ In this regard defendant objects to the instruction that the pertinent evidence concerned "the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged." According to defendant, his *"mental condition"* was not in issue at this stage of the trial, for he was presumed sane; rather, defendant says, "The issue was, what was defendant's *state of mind* in the alleged commission of the acts charged." (Italics of defendant.) Defendant's attempted distinction between "mental condition" and "state of mind" appears overly subtle. There is nothing in the reference to "mental and nervous condition" in this instruction, and nothing in the other instructions, which could reasonably have misled the jury as to the matters which they had to determine.

■ Defendant complains of the following instruction: "This evidence as to capacity or lack of capacity to deliberate and premeditate in the formation of a specific intent to kill is for your consideration in the determination of the degree of murder, in the event that you find that murder was committed by the defendant, and for no other purpose." This instruction does not, as defendant contends, restrict the jury's consideration of evidence of defendant's *"mental condition . . .* to the *degree* of the crime, 'and for no other purpose.' "" (Italics of defendant.) The instruction refers to the difference between degrees of murder "in the event you find murder was committed by the defendant" and is designed to preclude a finding of murder in the first degree (i.e., that defendant's

murderous intent was formed after deliberation and premeditation) unless the jury found that he had the capacity to premeditate and deliberate. Manifestly, the trial judge could not, in a single instruction, explain all the differences between and the essential elements of the several classes and degrees of homicide.

As stated, the judge instructed the jury, concerning the "deliberate and clear intent to take life" which, on one theory of the law, is an essential element of a finding of first degree murder, that "It must be formed upon a preexisting reflection and not upon a sudden heat of passion or provocation *or other circumstance* sufficient to preclude deliberation and premeditation." (Italics added.) Defendant complains that the judge did not tell the jury what such "other circumstance" might be. However, it appears clear that the jury, from their common knowledge and from the testimony of the psychiatrists, would have in mind the sort of "circumstance" relevant to the state of mind of this defendant.

Defendant complains of the refusal of his requested instruction that "if the prosecution should fail to prove beyond a reasonable doubt any material element of murder of the first degree, but have proved beyond a reasonable doubt the material elements of murder of the second degree, it shall be your duty to return a verdict of guilty of murder of the second degree." The substance of this refused instruction was covered by the following instruction which was given: "If you find beyond a reasonable doubt that the defendant is guilty of the crime of murder, but entertain a reasonable doubt as to whether it is murder of the first degree or murder of the second degree, then it would be your duty to return a verdict of murder of the second degree. . . . However, you must be convinced beyond a reasonable doubt before you can find him guilty of any offense."

For the reasons above stated, in the light of the record viewed as a whole, the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Spence, J., and McComb J., concurred.

Appellant's petition for a rehearing was denied March 27, 1957.