[Crim. No. 6814.   Second Dist., Div. Three.   May 31, 1960.]

THE PEOPLE, Respondent, v. ROBBIE DEE FUQUA, Appellant.

Ellery E. Cuff, Public Defender (Los Angeles), J. Stanley Brill and Richard W. Erskine, Deputy Public Defenders, for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Respondent.

FORD, J.—The appellant Robbie Dee Fuqua and his codefendant Donald Ray Hart were convicted of the crime of murder in the second degree in a trial in which they waived their right to trial by jury. The motion of the appellant for a new trial was denied. Proceedings were suspended without

the imposition of sentence and the appellant was placed on probation for a period of five years, one of the terms thereof being that he spend the first year in the county jail. He appeals from the judgment and from the order denying his motion for a new trial.[1]

The contention of the appellant is that the evidence was insufficient to support the conviction because "the prosecution is bound by the exculpatory parts of the statement which it produced to prove the crime." Reliance is placed upon *People* v. *Salaz,* 66 Cal.App. 173 [225 P. 777], *People* v. *Estrada,* 60 Cal.App. 477 [213 P. 67], and *People* v. *Toledo,* 85 Cal.App.2d 577 [193 P.2d 953]. It will be necessary to state the evidence which is pertinent to the issue thus raised.

Georgia Hill Walker, the only witness, other than the defendants, to the incident which resulted in the death of Edward Joseph May, testified as follows: About 10:30 p.m. on August 21, 1958, she returned to the home in which she was living with Mr. May. She had been drinking "since early that day." After she returned home, she, May and the two defendants were there. Mr. May told the defendants to leave. They left but they came back. At that time, she was on the floor and May was holding her down by her wrists, but he did not strike her. He was "mad" because she had been away from the house so long. She thought that the defendant Hart hit May and she remembered that both of the defendants picked him up and carried him into the bedroom. She did not know whether he was unconscious. She had drawn $400 out of the bank and had given May some money to pay bills but she was not sure how much she had given him. He had about $276 and she told him to hide it.[2] She did not recall any discussion about any money when the defendants were in the house. She went into the bedroom later after the appellant came out and said, "Ed is hurt awful bad; I think he is dead." May was bleeding through the nose and blood was all over his face. She wiped his face with a wet towel. She said, "Call a doctor." A doctor did not come. She went back into the living room and sat down and the next thing which she knew was

---

[1]Section 1237 of the Penal Code is in part as follows: "An appeal may be taken by the defendant:

1. From a final judgment of conviction; an order granting probation shall be deemed to be a final judgment within the meaning of this section;

2. From an order denying a motion for a new trial."

[2]On August 22, Officer DeMateo found $270 hidden "at the rear of the top dresser drawer" in the bedroom.

that the police were there. On cross-examination, she testified that the appellant and May had been very close friends over the preceding year and had visited together frequently. She did not see May strike the defendant Hart at any time that night. She was drunk.

An autopsy surgeon testified that he ascribed the death to asphyxia due to the inhalation of blood following a fractured nose.[3] Other conditions which he found were: "Acute scalp hematomata" and "Acute alcoholism." In response to a question as to whether any of the acute scalp hematomas could have caused unconsciousness, the witness answered that "the continuous sustaining of force that produces them also produces unconsciousness."

Edmund R. Chappel, a police officer of the city of Alhambra, testified that he arrived at the May home about 1:42 a.m. Officer Nixon accompanied Chappel. The ambulance attendants entered at the same time. Officer Chappel examined May's wallet and found no money in it.

Ted B. Bennett, a police officer of the city of Alhambra, had a conversation with the appellant Fuqua at the May home at about 2:40 a.m. on August 22. Fuqua said that during the course of the evening, after an interval of drinking, Georgia Hill (as Mrs. Walker was then known) put her arm around Fuqua and May walked over and, after objecting verbally, "swung at Fuqua." Hart intervened and in the ensuing struggle a glass of beer was spilled on Hart's sweater and May was knocked to the floor. Eventually all four arrived in the bedroom where an argument took place. Fuqua and Hart were asked to leave by both Georgia Hill and May and they left. After Fuqua moved his automobile out of the driveway, he parked up the street and noticed that Hart had parked in front of the house. Fuqua went to the point where Hart was.

---

[3] The explanation given by the witness was in part as follows: "Now, in a situation either of unconsciousness or of the position on the back so that the bleeding would be what we would call posterior in direction or back towards the back of the nose, in an individual to help himself because his reflexes are batted down either by a trauma or having had a conscious [sic] or being unconscious or being inebriated or anything that would make him unconscious or unable to help himself, the normal automatic movements of respiration will go on whether they are conscious or unconscious so that when the blood coming from this nasal fracture would be into the windpipe, there would be no reflexes on the part of the individual to get rid of it and this blood would consequently be inhaled deeper and deeper into the lungs and the blood in that instance a solid substance would act as a separate obstruction to oxygen into the lungs which is necessary to maintain life, and that constitutes asphyxia and causes the death of the individual."

514

They heard loud noises coming from the house and ran up to the front porch and attempted to enter but the front door was held by a chain latch which allowed it to be opened three or four inches. They saw Georgia Hill on the floor and May was straddling her or holding her down and striking her. Hart said, "I can't stand to see a woman beat up," and ran around to the rear. When Fuqua saw Hart enter the rear door, he also ran around to the back. He arrived just as Hart came into the living room and fell to his knees. Hart asked Georgia Hill if she was hurt, and she said, "Yes, he is hurting me. He always takes advantage of me when we have been drinking." Hart struck May, knocking him away from Georgia Hill. They picked him up and carried him into the bedroom. He and Hart returned to the living room where Georgia Hill was and resumed drinking and talking. After a short time they heard a loud thump and rushed into the bedroom and noted May lying on the floor against the southwest wall. He and Hart picked him up, attempted to revive him by wiping his face with a wet towel, and then called an ambulance.

At the police station, another statement, which was recorded, was taken from Fuqua at about 5 a. m. Therein Fuqua said in part as follows: Earlier in the evening Hart told Fuqua that May was supposed to have about $300 which he had obtained from Georgia Hill and "he says maybe if we get him real drunk we can take some of it . . . and he'll never know the difference, so that sounded all right to me." Fuqua and Jim Brady, May's son-in-law, had on previous occasions removed money from May's pocket when he was drunk. Fuqua then stated: ". . . so I agreed that we'd try to get Ed drunk and put him in bed and take, take some of his money, not all of it, just some of it, and so me and Ed [May] left for the liquor store and Don stayed there at the house." This was about 10:30 [p. m.]. When they returned, Georgia Hill had come home. The four then sat in the kitchen and talked and drank. Georgia Hill got up and put her arm around Fuqua. May told Fuqua to get out. May turned around as if he were going to walk away and then "swung at me." Fuqua grabbed him by the arms. Hart shoved May and May fell down on the floor. Fuqua then took May into the bedroom and tried to calm him. Hart and Georgia Hill entered the room and an argument ensued between Hart and May in which Georgia Hill participated. Fuqua and Hart thereafter left the house after Fuqua had taken some food and beer which was in the refrigerator.

They were out in front of the house, leaning against the fender of Hart's automobile and drinking beer, when "we heard Ed's and Georgia's voice yelling and making a bunch of, of commotion and everything, so Don [Hart] said let's go up there and see what they're doing. At that time I had given up—— I, well, I had forgotten all about, seeing that, ah, the trouble and everything was caused by, ah, getting any of Eddie's money.''[4] They went up to the door. Fuqua then continued as follows: "And I—— Don and me both thought that they were scuffling in there, and so Don said let's go in there and break it up; that he didn't like a man hitting a woman, so Don opened the front door, but it was—— had a chain latch on it and we—— it would only open about three inches. Georgia was laying on the floor and Ed was kneeling by her. They, they didn't even seem to notice that we were at the door or anything because, ah, Ed just kept on arguing with her, telling her she was a liar and so Don ran around the house. . . . Don ran around the house and I stayed there at the front door and then I seen him, Don, coming in the back door, so I ran around because I didn't want, I didn't want a bunch of trouble there, so Don ran up there and jerked Ed off *a* Georgia and hit him and Ed fell back on the floor. . . . He, ah, walked over there and

---

[4] It is to be noted that it was stipulated that evidence of conversations would be offered only as against the defendant making the statements when both defendants were not present at the time, the People "reserving the right to have the conversation admitted as to both of them in the event . . . [that it should be shown that] there was a conspiracy to accomplish a certain purpose here.'' In his brief the appellant makes reference to Hart's statement made outside of the presence of the appellant with respect to his intent at the time of the fatal encounter. That statement was as follows: "Well, when I started back in the house, when I started back up there, I mean I wasn't mad because, you know, what it was, we'd been, we'd been arguing and everything, you know, and, and been pushed around and everything and I was going to go in the house and settle it, but at the time when I, when I started up the walk I didn't have any intention, I swear to God I didn't have any intentions of taking the money, but it was just between him just . . . a fight between him and I. I had no intention when I went up to the door and we heard her screaming and, ah, I said let's stop that, *Don* says oh wait a minute we can't be sure he is doing, he is hitting her or anything. Opened the screen door, opened the front door and there was a latch on and he was on top of her. He, he was swinging her and slapping her, you know, his hand were all over like that, so I couldn't get in the front and I ran around to the back door. I come busting in, I fell on my knees and told him to get away and asked if she was all right, and he was, he started cussing at me, I looked up and, I was on my knees, and looked him in the face and I hit him.'' The use of the symbol "". . .'' indicates a portion of the record which was not sufficiently clear to permit a transcription thereof.

that—— and Ed at the time he hadn't hit Georgia, well he wasn't hitting Georgia then because Don ran around over there and asked Georgia if she was hurt. . . . If Ed had hit her, and she said right after you guys left he started in on me, he says—— she says he wouldn't do it when he is sober, when he gets like that he always blames it on me after everybody leaves. So then Don walked over to Ed and hit him. . . . And then Don hit Ed and Ed went down on the, the floor on his back. . . . And Don walked over and kind of raised him up a little bit and backhanded him two or three times. And so Ed's nose started bleeding and he looked like he was knocked out because his nose started bleeding, started bleeding and it was bleeding quite a bit because he, he had to have his mouth open to breath[e]. He was breathing like he was hard—— like it was hard to breath[e]. So somebody said well let's carry him into the bedroom. So Don picked him up by the front, ah, his head and shoulders, and I picked him up by the legs and we carried him into the bedroom and laid him down on the bed and at that time he was still breathing. . . . [After a question as to whether May suffered any injury while being carried into the bedroom] No, ah, not that I know of because, ah, he was pretty heavy and it was pretty hard carrying him. He could have hit his head, ah, I don't remember it but he could have 'cause he was pretty hard to carry and everything, we were walking with him pretty fast in there. And so me and Don, earlier when we talked about the money, decided that anything one of us got that we'd split fifty-fifty. So when we laid him down on the bed, Don looked and got his wallet and brought it out. . . . Yeah, and opened it up. No, before he found the wallet, he reached in one pocket pulled out a dollar bill that was crumpled up in the pocket, then he had the wallet out and there was three five dollar bills in there so he gave me one five and he took the other five and put the other five back in Eddie's wallet. . . . So we left him there and went back in there and so Don started talking to Georgia and telling, in the living room, telling her that, ah, he was sorry for the trouble and that kind of stuff and that it wouldn't happen again, so while he was talking I went to the restroom and, ah, went back to the back bedroom and, ah, I was *gonna* get that other five. . . .'' After Fuqua took the last five dollar bill and became alarmed at the condition of May, he called an ambulance. As to whether there was a discussion

between him and Hart before they returned to the house as to going back to attempt to get money, Fuqua further stated: "Well, I think we discussed it just a minute, ah, we knew, both knew that Ed was pretty drunk. . . . And that a, a few more shots and he'd pass out and so we heard this commotion up there and, ah, that set that off so we went up there, ah, to try to straighten that—— to, to calm them down, so then we could, we could continue where we left off earlier." Then the following questions and answers were recorded:[5] "B Now, did Don, ah, at any time say, ah, maybe I should knock him out, or something like that, so we can get the dough? F Ah, yes, ah, earlier that evening, I mean, I, well, I mean, you know guys talk. B Yeah. F I mean, I didn't, I didn't, I, that, that wasn't even entered my mind after he says, he said that, ah, well when he gets to drinking and everything, if he won't pass out maybe we can knock him out. B Yeah. F And get it. But I mean, ah, as far as I'm concerned that wasn't planned on, ah, anything like that wasn't more or less planned on with me, ——B Um hum. F —but, ah —B Actually it was in the back of Don's mind, he discussed it, isn't that it? F It could *a* been, I mean, ah, that's what he said. . . . B Actually, ah, when you went back to the house the second time, you heard this commotion, wasn't it for the purpose of either you or Don to try to get Ed to drink more or if that didn't seem to be a good idea, for either you or Don to knock him out so that you could get the money? F Um hum. B Isn't that correct? F Um hum. B That is. F But, ah, he had, ah, said, ah, to me and I probably agreed at that time that that's what we'd do. B Um hum. F You know, if we couldn't get him to pass out that we'd knock him out but, ah, I don't think that I could have hit Ed because if, if I was planning on *hit* him I'd have hit him when he struck at me earlier in the evening. B Um hum. T Well, do you think that that Don Hart, ah, carried the ball as far as Ed, do you think that's why he struck him, ah? F *M*o. I don't, well, I don't know, I don't know what was in the back of Don's mind, but, ah, like I said, when we went in there and Georgia was crying and everything Don cussed, I think he called Ed a son-of-a-bitch and walked over and hit him. B But wasn't it a fact that a good part of the evening Don had tried to

---

[5] "B" represents the voice of Officer Bennett, "T" that of Officer Twitchell, and "F" the voice of appellant Fuqua.

get Ed to start a fight with the possible hope that Ed would get knocked out for the purpose of taking his money? F Yes. But —B The fact is Don through a good part of the evening deliberately antagonized Ed? F Yes. B To try to get Ed to have him fight him? F Yes.''

At 1:30 p. m. on August 22, Officers Bennett and Twitchell had a conversation with the defendant Hart and the appellant Fuqua which was recorded. Part of that conversation was as follows: Hart said that he and Fuqua ''just started talking about it, that he had a large amount of money, you know, we should wait 'til he passes out or, you know, drinks quite a bit until he passes out and then we'd take it.'' Officer Twitchell asked, ''What, what if you couldn't get him drunk enough to pass out?'' Hart replied, ''Well, we mentioned hitting him or something or knocking him out.'' Fuqua was then asked if that was ''the way you more or less remember the conversation,'' and he answered, ''Yeah, yeah.'' Fuqua did not know whether the idea of getting the money was his idea or Hart's. Fuqua was asked what he remembered of the conversation with Hart after they left the house. He stated: ''Well, I wanted to wait until they, the lights went out, see, and they went to bed and went to sleep, once they went to sleep, in the condition that they were, ah, I mean, they couldn't *woken* up, I was all for crawling through the window, you know, and looking through Ed's house and, ah, there was a bunch of noise. We were discussing this on the front porch at that time, there was a bunch of noise coming from in there and Don said, ah, he's beating her up. . . . He said we can't let him do that so he tried to open the door and it had one of those chain latches on it and we could just see so much but we could see that Georgia was laying on the floor and Ed was kneeling by her.'' He did not actually see May strike Georgia Hill, ''but just looking through the door it looked like he had been or else was going to.'' Hart stated: ''I couldn't get in the front door and so I ran around the back door and I come in and, ah, he was kneeling over her, pushing her, you know, and I got on my knees and I told him to get away, yeah, I told him to get away and I asked her, I says, are you all right, Georgia, and she was cussing and said he had been beating me or something like that. And he said something to me, you know, he cussed at me or something and then, oh, I hit him then.'' After Hart completed his statements as to that occurrence, Fuqua was asked if that was more or less his version of what happened and he answered,

"Yes." As to Hart's actions, Fuqua further said: "Well, he did, he did kneel down on his knees and ask Georgia if she was hurt and she was bawling and cussing and saying that he had been beating me up. . . . So, then Ed started cussing Don and then Don hit him. I don't know if he raised up when he him [hit] him or stayed in the position he was. . . . Ed fell down, over there and so Don went over there and, and slapped him two or three times after he hit him that one time. . . ." He further said that May's nose started to bleed and he was lying on the floor on his back and appeared to be "knocked out." Hart stated that May was moving after the first blow and Fuqua said, "Yeah, like a groggy fighter would in the ring, you know." But, Hart said, after the slaps, it was "just like he had passed out" and he began snoring and breathing hard. Fuqua said that they carried May into the bedroom "and tossed him on the bed, and ah, rolled him over on his side, we looked through his pockets, you know, to see if he had any of that money on him and, ah, Don [Hart] reached in one pocket and there was a single dollar bill in there, so he took that, then he found a wallet and there was $15 in there and he give me five and he took five and put one five back in Ed's wallet." Fuqua said that later he went back into the bedroom "to see about getting the other five" and he "took the five." Hart said that Fuqua later called an ambulance.

As a witness on his own behalf, on direct examination Hart testified as to the incident when May had Georgia Hill on the floor as follows: "Well, I parked my car out in front, and Robbie parked up the street in front of my car. I asked him if he got any of the beer, and we opened a can of beer on the curb. We were leaning against the car drinking and talking about all the trouble, I mean, what could have been caused there, you know, a big fight, and everything. So I said, 'I am glad we left.' And that is when we heard this screaming and yelling coming from the house. . . . We ran up to the door, we were still on the porch, and we listened for awhile, and we heard them arguing; then we heard a slap. . . . Well, I opened the screen door, and I tried to go in the front door, and it had a chain lock on it, and it would open so far only, to where I could see in. And I saw Georgia on the floor, by the couch, and Ed was on top of her. . . . Well, I told Robbie, 'We have got to get in there; we can't let him beat her up like that.' So I couldn't get in the front door, so I ran around to the back door. I ran in the back door

and ran over to Georgia, and I fell down on my knees and I asked her if she was all right. And she was crying, and she said, 'No, he has been beating me.' So I asked him to leave her alone. . . . One hand was on her arm—one hand was on her arm, and the other hand was raised back. . . . Well, I asked him to leave her alone, and he says, 'Why, you son of a bitch,' and his fist was doubled up and his arm was back like he was going to throw his arm forward, and throw a punch at me, so I hit him. . . . I hit him with my fist. . . . Well, he fell off her, and I jumped over on top of him and I slapped him. And I asked Robbie, I said, 'Robbie, come on, give me a hand with him and we will lay him on the bed.' So Robbie picked him up by his feet and I picked him up under his arms, and we carried him into the bedroom and threw him down there on the bed. . . . Well, then we went through his pockets to see if he had any of Georgia's money, that Georgia asked me about earlier. And we got into his wallet and he had some money in there, and we took that out.'' He testified that the only reason he struck May in the face with his left hand was because ''he was on top of Georgia beating her.'' On cross-examination, Hart testified in part as follows: ''Q. When did you first find out there were three hundred dollars around the house? A. When Georgia told me. Q. And you believed at that time that Ed May had $300.00 on him, didn't you? A. Yes, sir. Q. And after that, you and Fuqua discussed getting Ed May drunk or knocking him out in order to get some of his money, didn't you? A. Yes, sir. Q. Where were you when you and Fuqua discussed either getting Ed May drunk or knocking him out to get some of the money? A. I'm not sure. I believe we were in the kitchen. Q. Just you and Fuqua in the kitchen alone, is that correct, at that time? A. Yes, sir. Q. And you referred to it as some of his, meaning Ed May's money, didn't you? A. No, sir. Q. You didn't at any time tell the officers it was Georgia's money, did you? A. I believe I did. Q. You did at some time? A. I believe so. Q. Do you remember when and who you told it to? A. No, sir. Q. As a matter of fact, you referred to it as 'his,' meaning Ed May's money, isn't that true, his money? A. I may have. Q. Now, when you were in the kitchen with Fuqua discussing means of getting that money, you said to Fuqua, 'It would sure be nice to have that money,' didn't you? A. Yes, sir. Q. And what you had in mind at that time was securing the money either by getting Ed May drunk or by knocking him out, isn't that true? A. That was talk. Q. That was what was in your mind, wasn't it? A. No, sir. Q. What

was in your mind, then? A. Getting Georgia's money back. Q. You mean for Georgia? A. Yes, sir. Q. Well, it was you that needed some money, wasn't it? A. Needed some money? Q. Yes. You wanted to get it for yourself because you needed some money, didn't you? A. Yes, sir. Q. Well, then, you did intend to get it for yourself, and not for Georgia, isn't that true? A. No, sir. Q. You knew from your past acquaintance with Ed May, did you not, that if he drank enough, he would pass out in time, is that correct? A. Yes, sir. Q. But you and Fuqua decided that if he didn't pass out—or discussed between you if he didn't pass out, you would be sure to see to it that he did by striking him, isn't that true? A. Yes, sir, I believe we said that. Q. And then after he did pass out —that is, he was passed out, I presume, when you took him into the bedroom, isn't that true? A. Yes, sir. Q. And you laid him on the bed? A. Yes, sir. Q. And immediately you went into his pockets to look for money, is that right? A. Yes, sir. Q. And you found some money? A. Yes, sir. Q. You found $15.00 in his wallet, is that right? A. I believe that is what it was. Q. And you gave Fuqua five and you took five yourself, is that right? A. Yes, sir. Q. And did you find the other one-dollar bill in there, too? A. No, sir. Q. Well, you took the other one-dollar bill, didn't you? A. Yes, sir. Q. You must have found it there? A. In his pants pocket. Q. You went through more than one pocket, then? A. Yes, sir. Q. Any reason why you left five dollars in his wallet? A. No, sir. Q. Isn't it true that you left the $5.00 in his wallet so that when he came to and discovered $5.00 in his wallet he would think he spent the rest and not know that it had been stolen from him isn't that true? A. No, sir. Q. Did you intend to give any of that money to Georgia? A. Yes, sir. Q. Did you give any of it to her? A. No, sir. Q. Did you at any time tell her you had gotten any money from Ed May? A. Yes, sir. Q. When did you tell her that? A. When I went back out into the living room. Q. What did you say to Georgia, then? A. I told Georgia that we had found about $15.00 on him. Q. But you didn't give her not even a dime of it, did you? Well, let's say not even a dollar of it, since it was all in paper—— Did you? A. No, sir, I didn't. Q. It was because you still had the $6.00 in your pocket when you were arrested? A. Yes, sir.'' He further testified that at the time of the fatal encounter, it was not his intention to get any money from May but he just wanted ''to get him off of Georgia.''

522

The appellant Fuqua testified in his own behalf. He admitted that at first he had told the officers an untrue story: "Q. Now, right after you and Don picked Ed up from the floor and put him back on the bed, did you and Don try to cook up a false story as to how he got on the floor? A. Yes, sir. Q. You were going to tell the police that you heard the thump from the front room and both went in and found him on the floor, is that right? A. Yes, sir. Q. You knew that wasn't true? A. Yes, sir. Q. When you talked to the officers on the back porch, which story did you tell them, the true one or the one that you had cooked up? A. I believe that I told them the one that we had cooked up first. Q. And they told you that that wasn't true, or something? A. Yes, sir. Q. Then you told them the truth? A. Yes, sir." On cross-examination he testified as follows: "Q. By MR. SMITH: That proposition of getting Ed May drunk so you could get his money sounded all right to you, didn't it? A. Well, as far as getting Georgia's money back for her, yes. Q. Isn't it true that you and Hart agreed that you would split everything 50-50? A. There was something like that mentioned. Q. That was the money that you got from Ed May that you would split 50-50, is that right? A. I believe it was mentioned, yes. Q. And you meant you and Don Hart, and you didn't include Georgia in that 50-50, did you? A. That is why I went back to get the other five. Q. What do you mean, you went back to get the other five? A. Because it was Georgia's money. Q. Did you tell Don Hart you were going back to get the other five? A. No, sir. Q. Did you tell Georgia that you were going back to get the other five? A. No, sir. Q. Did you tell her you had gotten any money from Ed May? A. I didn't, no." He further testified: "Q. Well, let's ask you this: After Hart got through slapping Ed May, he appeared to be unconscious, didn't he? He passed out, didn't he? A. Yes, sir. Q. And you and Don Hart immediately picked him up and took him in the bedroom, isn't that true? A. Well, he helped Georgia to the couch first, and then we carried him to the bedroom. Q. And then you immediately took him in the bedroom after Georgia was on the couch, is that right? A. Yes, sir. Q. And then you immediately, you or Hart, immediately went through his pockets to find the wallet, that is true, isn't it? A. After Don said about seeing if he had Georgia's money. Q. And at that time you believed that Ed Hart [sic] had approximately $300.00 on his person, isn't that true? A. Yes, sir. Q. Now, were you in the kitchen when you first discussed this getting Ed May

knocked out, either from liquor or from blows, to get his money? A. Yes, sir.''

In the course of stating his decision that the defendants were guilty of the charge of murder in the second degree, the trial judge said: ''I am satisfied in my own mind that these young men planned a course of procedure to get the money of the victim. I don't believe there was any abandonment of that original plan. The fact that they carried it out satisfied me beyond a reasonable doubt that there wasn't such an abandonment; that they carried through the original plan to its fruition.''

We turn now to the cases, mentioned above, upon which the appellant primarily relies. In *People* v. *Estrada*, 60 Cal.App. 477 [213 P. 67], the only direct evidence that the deceased was killed by the defendant consisted of a written statement made by the defendant shortly after his arrest. The defendant did not testify at the trial. The judgment of conviction of manslaughter was reversed. The court said, at pages 481-483: ''In our opinion there is nothing indicated by the narrative as expressed in the statement of the defendant to warrant the conclusion that defendant, in repelling the attack of Murillo, acted other than in necessary self-defense. . . . It was not necessary that the defendant should have in words pictured his state of mind as it was at the time of the attack, for under his statement of the encounter the circumstances were such as to indicate nothing else but that by doing what he did he was defending himself against a murderous assault then being made by the deceased. . . . The proof on the part of the prosecution (referring now to the statement of the defendant) did, as we have indicated, show a case of justification, and there is nothing in any of the other evidence presented which in anywise tends to contradict or dispute defendant's version of the affair. . . . We conclude that defendant's first contention is well made and that the verdict of the jury is not supported by the evidence.''

In *People* v. *Salaz*, 66 Cal.App. 173 [225 P. 777], the court said, at page 181: ''The jury could not have found, from the evidence for the people, that the killing was done by appellant except upon the latter's admissions which carried, in close and immediate connection with proof of the killing, circumstances of necessary self-defense. Since, therefore, the proof on the part of the prosecution tends to show that the act of appellant was justifiable, there was, at the close of the people's case, no presumption against the accused that he had committed an

unlawful homicide. No presumption of guilt weighed against the presumption of innocence. 'Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, *unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.*' (Pen. Code, § 1105.)

"But it does not necessarily follow that appellant's account of the killing, though uncontradicted by direct evidence, should control the jury. If there be any well-established circumstance in the case which may reasonably be regarded as incompatible with the theory of the defense that the killing was justifiable, then the jury, from a consideration of all the evidence, was warranted in finding that the act amounted to an unlawful homicide. The question therefore is: Does the record furnish evidence of any circumstance which cannot reasonably be reconciled with the theory that appellant acted in self-defense?"

A judgment of conviction of manslaughter was reversed in *People* v. *Toledo*, 85 Cal.App.2d 577 [193 P.2d 953], on the basis of reasoning similar to that found in the Estrada and Salaz cases.

More recently the Supreme Court has had occasion to state the applicable principle as follows: "The sentence in the Salaz case which, according to defendant, should be applied to the present case, does not stand for a rule of law that a defendant cannot be convicted if the prosecution introduces *some* evidence which tends to prove that defendant did not act in the manner or have the state of mind which is necessary to constitute a crime and there is other evidence sufficient to show guilt. As the Salaz case itself indicates, if there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed. (See *People* v. *Freudenberg* (1953), 121 Cal.App.2d 564, 575-576 [263 P.2d 875]; *People* v. *Rutland* (1953), 120 Cal.App.2d 798, 800 [261 P.2d 735]; *cf. People* v. *Howard* (1930), 211 Cal. 322, 329-330 [295 P. 333, 71 A.L.R. 1385]; *People* v. *Holt* (1944), 25 Cal.2d 59, 90-93 [153 P.2d 21].)

The courts may sometimes say that the prosecution is 'bound by' extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is

no other competent and substantial evidence which could establish guilt. (See *People* v. *Jacobs* (1952), 111 Cal.App.2d 281, 283 [244 P.2d 500] ; *People* v. *Coppla* (1950), 100 Cal.App.2d 766, 769 [224 P.2d 828].) '' (*People* v. *Acosta*, 45 Cal.2d 538, 542-543 [290 P.2d 1].) A helpful discussion is also found in *People* v. *Johnston*, 48 Cal.2d 78 [307 P.2d 921]. In that case, in the defendant's testimony at the trial he gave materially the same account of the killing as was contained in his statements made to a deputy district attorney shortly after the killing and to another deputy district attorney the day after the killing. The Supreme Court said, at pages 82-83: ''Defendant urges that his undisputed testimony and statements to the deputy district attorneys show that no sufficient interval for deliberation and premeditation elapsed between the time that he cut the boy slightly, with no purpose to kill, and the time that he cut the boy's throat to silence his screams. The jury, however, could disbelieve the evidence that defendant's original purpose as he waited for the boy with open knife was merely to cut him slightly, and could believe, from other evidence, that defendant's purpose was a lustful intent to kill. And there was evidence upon which the jury could predicate a determination that this intent was formed willfully, deliberately, and after premeditation.

''Portions of defendant's testimony and his statements to the deputy district attorneys are to the following effect: Defendant saw the boy leave the theater. Defendant almost immediately thereafter left the theater, looked about the lobby and saw that the boy was not there, concluded that the boy had gone to the men's room, and himself went to the men's room. From the sounds which defendant then heard, he concluded that the boy was in the booth. The jury were not required to believe defendant's testimony that he decided to cut the boy slightly when defendant heard him in the booth; they could determine that defendant followed the boy from the theater to the men's room with the formed purpose of cutting him fatally. According to one of defendant's statements to a deputy district attorney defendant left his seat in the theater 'about half a minute or so, maybe more,' after he saw the boy walk down the aisle, and in response to the question 'Did you expect to see him in the toilet?' answered 'Yes, I expected to.'

''It is defendant's position that, despite the foregoing extrajudicial statements and the testimony of defendant, the

People are bound by portions of the extrajudicial statements of defendant, introduced in evidence by the People, such as the following: Defendant cut the boy 'Mainly to see what would happen, I guess . . . to see what the reaction would be.

" 'Question: When did it enter your mind to do that? Answer: After I had gone into the head. . . .

" 'Question: Tell me, did the little boy have anything to do with your going to the restroom? Answer: No. . . . I would have gone up anyway if he hadn't gone out . . . I thought to grab this kid as he came out and my original intention was to just cut him a little bit and scare him but——

" 'Question: (Interposing) Any reason for that? Answer: No. . . . [O]ther than just scare him was my original intention. Then I got panicky and killed him.'

"Defendant urges that 'where the prosecution introduces evidence favorable to the accused and does not controvert such evidence, the prosecution is bound by such uncontradicted evidence' (citing *People* v. *Coppla* (1950), 100 Cal. App.2d 766, 769 [224 P.2d 828]; *People* v. *Toledo* (1948), 85 Cal.App.2d 577, 581 [193 P.2d 953]). But here the statements of defendant presented by the People were not all uncontradicted evidence in his favor. Rather, the very statements of defendant on which defendant now relies contained, among other evidence, evidence on which, as already indicated, the jury could predicate a determination (based on the evidence in the case as a whole, rather than the isolated statements of defendant which he contends show lack of deliberation and premeditation) that defendant followed his victim from the theater with a formulated intent to injure him fatally."

The contention of the appellant in the present case revolves around the claim that the statements received in evidence show that the "motivation for the striking of decedent by Hart was not for the purpose of getting money" but, rather, was the concern of the defendants "about the beating of Mrs. Walker by the decedent." The trial court was, of course, dealing with the state of mind of each of the defendants at the time of the striking of May by Hart. As succinctly stated in *People* v. *Lyles*, 156 Cal.App.2d 482 [319 P.2d 745], at page 486: ". . . intent is rarely susceptible of direct proof and ordinarily must be inferred from a consideration of all the facts and circumstances shown in evi-

dence. ▆▆ And, it necessarily follows, that if the evidence is sufficient to justify a reasonable inference that the requisite intent existed, the finding of its presence in a particular case, may not be disturbed on appeal.'' ▆▆ In the present case, Mrs. Walker testified that she thought that the defendant Hart had hit May. The nature of the injuries received by May was such as to justify the trier of fact in reaching the conclusion that more force had been used than was reasonably necessary under the circumstances to divert May from his attack upon Mrs. Walker. The appellant Fuqua testified that at first he had told the officers an untrue story as to hearing a noise and finding May upon the bedroom floor. Fuqua's statements which were offered by the prosecution were sufficient to sustain the inference that the defendants had planned to take money from May's person when he should become so intoxicated that he would not be aware of the theft or, if that did not occur, when May should become unconscious as a result of blows from the defendants or one of them. Moreover, it is obvious that the appellant was referring to the plan to obtain May's money when, in one statement with respect to the conversation after he and Hart had left the house, the appellant said: ''Well, I wanted to wait until they, the lights went out, see, and they went to bed and went to sleep, once they went to sleep, in the condition that they were, ah, I mean, they couldn't *woken* up, I was all for crawling through the window, you know, and looking through Ed's house and, ah, there was a bunch of noise. We were discussing this on the front porch at that time, there was a bunch of noise coming from in there and Don said, ah, he's beating her up.'' Immediately after Hart struck May several times, the defendants carried him into the bedroom and took money from his wallet. Such evidence was sufficient to support the inference that such purpose of taking money from May motivated the defendants at the time May was hit, unless, under the authorities upon which the appellant relies, the trial court was bound to accept literally the assertions of the appellant and Hart that at that moment their plan of taking money from May had been temporarily abandoned. The trier of fact might reasonably infer that an additional motivation—that of protecting Mrs. Walker—had conveniently joined rather than displaced the desire to steal May's money. In this connection, the trier of fact might well

conclude that more force was used than was reasonably necessary to stop May's attack on Mrs. Walker. Certainly, where the statement of a defendant bears in itself indicia of inconsistency, which gain weight and importance in the light of the other evidence, it cannot be said that such defendant's version of the affair is in nowise contradicted or disputed. On the contrary, the reasoning in *People* v. *Johnston, supra,* 48 Cal.2d 78, 82-83, which has been quoted herein, is applicable. (See also *People* v. *Jones,* 159 Cal.App.2d 808, 810-811 [324 P.2d 291].)

"As so often repeated, the function of an appellate tribunal begins and ends with a determination of whether *the record on appeal contains evidence, contradicted or* uncontradicted, which supports directly or upon reasonable inferences drawn therefrom, the conclusion of the trier of the facts. As was said by our Supreme Court in *People* v. *Newland,* 15 Cal.2d 678, 681, 682 [104 P.2d 778], in the performance of that function, ' "We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict." If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (Citing cases.)' " (*People* v. *Lyles, supra,* 156 Cal.App.2d 482, 487-488.)

With respect to the determination of the trial court that the killing constituted murder in the second degree, the appellant is in no better position to complain than was the appellant in *People* v. *Bauman,* 39 Cal.App.2d 587 [103 P.2d 1020], wherein it was said at page 591: "Assuming that there could be a reasonable doubt on the part of a jury as to the intent of appellant to commit robbery, or that the act was not the result of previous planning or deliberate determination, and assuming that the crime was one of 'drunk rolling', with an intent to commit larceny rather than robbery, nevertheless the felonious intent to commit larceny by the use of felonious means, in the perpetration of which the victim was slain, would constitute murder of the second degree. Under such circumstances malice is implied. (Pen. Code, § 188; *People* v. *Garnett,* 9 Cal.App. 194 [98 P. 247].) A

felonious purpose, accomplished by felonious means, is sufficient to constitute murder in the second degree.''

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.