ASHBURN, J.
 

 Charged in Count I of an information with murder (Pen. Code, § 187) of Richard Ortega, on July 30, 1961, and in Count II with assault with a deadly weapon (Pen. Code, § 245) committed upon Raul Navarro on the same date, defendant after a nonjury trial was convicted of voluntary manslaughter on Count I and assault as charged in Count II. Being 19 years old he was committed to the Youth Authority for the term prescribed by law. The appeal is from the judgment and appellant’s counsel argue that the evidence is insufficient to sustain the conviction upon either count and that the finding of guilty is contrary to law in each instance.
 

 Viewing the evidence in the light most favorable to respondent as we must do (People v.
 
 Newland,
 
 15 Cal.2d 678, 681 [104 P.2d 778];
 
 People
 
 v.
 
 Daugherty,
 
 40 Cal.2d 876, 885 [256 P.2d 911]), the situation appears to be as follows.
 

 On July 29, 1961, Anna Romero, aged 15, had a party at her home, number 2317% Daly Street, Los Angeles, starting at 8 p. m. There were two residences on the lot and that of the Romeros was in the rear; each had a lawn in front of it. Anna had issued written invitations to some 30 to 35 people. By the time her mother called an end to the party at 11:30 p. m. the house was crowded. Among other uninvited guests were defendant Robert V. Lopez, the victims Richard Ortega (commonly known as Puppet) and Raul Navarro. The hostess knew none of these people. They arrived separately. As the crowd was departing a fight broke out in the front yard of the front house and there may have been a hundred people on the lawn at that time, according to Anna. Who started it or what the cause is not disclosed by the record unless defendant’s statement to the police officers made at 2:30 a. m. on July 30th is accepted as true; the trial judge obviously disbelieved it. Defendant, present at the trial, did not testify.
 

 Prosecution witness Ronnie Altamirano, aged 17, saw Ortega fighting but did not know with whom he was so engaged; he imagined it was defendant. Ortega had no weapon and no one other than defendant was seen by any witness to have a knife. At the time of the stabbing defendant had received no apparent injuries. Altamirano did not see Ortega hit anybody but did see defendant stick Ortega with a knife, one which proved to have a blade some six to eight inches long. It
 
 *810
 
 seemed to the witness that Ortega did not know he had been stabbed and kept on trying to fight; soon he was lying on the ground bleeding from a wound in his chest which caused his death and was described by the autopsy surgeon as a “stab wound of chest penetrating right lung and heart with massive hemorrhage.” Defendant told Officer Pena that he remembered ‘ ‘ cutting the two guys, maybe three guys, and somebody was stabbed.”
 

 Defendant had come to the party with Carlos Montez (who had been invited) in the Montez ear. As the fight grew it became noisy and rough. Bottles were being thrown and were breaking. A neighbor, Jane Bradford, said: “I heard the kids around the house and talking loud, and, well, using all kinds of language and then I heard the breaking of bottles and the fight started. So my husband shouted, ‘ Go home,’ and they didn’t.” So her husband shot a gun six times into the ceiling “to warn the gang,” and she did so three times. She also said it was too dark to see but there were “approximately 200 out in front breaking bottles—it seemed like they were chains or something—and I didn’t see anything, it was too dark.” Defendant apparently was hit by a bottle, he thought it was a broken one, and his head was bandaged when the police arrived and arrested him. Some people in the crowd were swinging belts around and Altamirano saw some of them swing in the direction of defendant but was not sure whether any belts landed on him. Navarro, in Marine uniform, drove by while the fight was going on and stopped to see how it was going. He heard the bunch “yelling” and knew his little brother was there so he went over to the crowd to see if he was fighting. Raul pushed his way to the middle of the crowd and “I got too close . . . and I got it,” meaning that he was cut in the left side and the back, he saw defendant do it. His wounds required ten stitches in the front and three in the back. He did not hit defendant with a bottle or anything else. Nor did he see any blow landed on defendant; he, Navarro, did not do any fighting. The crowd was pushing toward defendant and the witness had difficulty in getting out. Defendant did not have any blood on his face at that time. Navarro did not see defendant waving or swinging the knife; defendant stabbed him; but witness Altamirano said that he saw defendant swing the knife back and forth.
 

 Gradually the fight moved over to the Montez car in which defendant and Montez were trying to leave. Montez was not in the fight but was on the back of the ear “trying to hold a
 
 *811
 
 lot of the guys away from Robert Lopez”; Montez had a bumper jack in his hand, Lopez was trying to get out of the crowd and Montez was saying, “stay back.” Certainly this was not the start of the fight but the end of it. Eventually both Montez and Lopez got into the ear and drove away, followed by flying bottles. Altamirano recalls seeing a girl in a red dress but did not know whether she was in the car as they drove away. On July 31 Grace May, who lived in the front house, found a knife on the lawn under the flowers; it appeared to have blood on it partially washed off by watering the lawn; the knife was sufficiently identified and was received in evidence.
 

 The prosecution called Officer James Pena as a witness to testify to statements made by defendant to him and Sergeant Quinn at the police station at 2:30 a. m. on July 30. He said: “The defendant stated that he and a person by the name of Carlos Montez and two girls went to the party and arrived at approximately 8:30. He stated that when they were getting ready to leave somebody tried to pull one of the girls out of the car and as he got out of the ear at about that time there were about 15 people jumped on him. Then, well, he was fighting and someone handed him a knife and told him to use it. So he remembers cutting the two guys, maybe three guys, and somebody was stabbed. He made his way back to the car and drove off and he threw the knife out of the window. He doesn’t recall just where. After they drove around a while he realized that there was a purse still in the car that belonged to one of the girls. So he drove back to the scene and when they did the police were there. So he told the police what had happened and was taken into custody and that was the extent of the conversation at that time.” Defendant also told Pena he had been struck by beer bottles, believed he was hit by a broken one and that somebody broke a bottle on his head. Also that people were swinging belts at him and he was hit consistently; that he was “attempting to defend himself from this attack by this bunch of guys.” He also said that when he and Montez drove off the girls were not in the car at all; that one of them had been pulled out of the car, he jumped out to assist her, she got back in and was pulled out again.
 

 As previously observed defendant did not testify, although the burden of proof was on him as to justification for the killing.
 
 [1]
 
 His counsel invoked the rule that the prosecution is
 
 *812
 
 “bound by” extrajudicial statements of defendant introduced by the People which are irreconcilable with guilt. But the rule is thus qualified in its correct statement found in
 
 People
 
 v.
 
 Acosta,
 
 45 Cal.2d 538, 542 [290 P.2d 1]: “The courts may sometimes say that the prosecution is ‘bound by’ extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt. ’'
 

 Counsel failed to take note of the fact that defendant’s failure to testify, while not supplying affirmative evidence, does emphasize any inferences adverse to him which arise from the other evidence. “Therefore the failure of the defendant to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable. . . . The failure of the accused to testify becomes significant because of the presence of evidence that he might ‘explain or . . . deny by his testimony’ (art. I, § 13, Cal. Const.), for it may be inferred that if he had an explanation he would have given it, or that if the evidence were false he would have denied it.”
 
 (People
 
 v.
 
 Adamson,
 
 27 Cal.2d 478, 489 [165 P.2d 3].) Accord:
 
 People
 
 v.
 
 Ashley,
 
 42 Cal.2d 246, 268 [267 P.2d 271].
 

 We quote from
 
 People
 
 v.
 
 Fuqua,
 
 181 Cal.App.2d 510 [5 Cal.Rptr. 408] : “The contention of the appellant is that the evidence was insufficient to support the conviction because ‘the prosecution is bound by the exculpatory parts of the statement which it produced to prove the crime.’ ” (P. 512.) “More recently the Supreme Court has had occasion to state the applicable principle as follows: ‘The sentence in the
 
 Salaz
 
 case
 
 [People
 
 v.
 
 Salaz,
 
 66 Cal.App. 173 (225 P. 777) ] which, according to defendant, should be applied to the present case, does not stand for a rule of law that a defendant cannot be convicted if the prosecution introduces
 
 some
 
 evidence which tends to prove that defendant did not act in the manner or have
 
 *813
 
 the state of mind which is necessary to constitute a crime and there is other evidence sufficient to show guilt. As the
 
 Salaz
 
 case itself indicates, if there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed.” (P. 524.) Quoting from
 
 People
 
 v.
 
 Johnston,
 
 48 Cal.2d 78, 83 [307 P.2d 921], the court further said in
 
 Fuqua: “
 
 ‘Defendant urges that “where the prosecution introduces evidence favorable to the accused and does not controvert such evidence, the prosecution is bound by such uncontradicted evidence” (citing
 
 People
 
 v.
 
 Coppla
 
 (1950) 100 Cal.App.2d 766, 769 [224 P.2d 828];
 
 People
 
 v.
 
 Toledo
 
 (1948) 85 Cal.App.2d 577, 581 [193 P.2d 953]). But here the statements of defendant presented by the People were not all uncontradicted evidence in his favor. Rather, the very statements of defendant on which defendant now relies contained, among other evidence, evidence on which, as already indicated, the jury could predicate a determination (based on the evidence in the case as a whole, rather than the isolated statements of defendant which he contends show lack of deliberation and premeditation) that defendant followed his victim from the theater with a formulated intent to injure him fatally. ’ ” (P. 526.)
 

 The proof in this case consists largely of hearsay and conclusions and speculation of the witnesses, received without objection. Although such evidence is to be considered as if intrinsically competent
 
 (Estate of Moore,
 
 143 Cal.App.2d 64, 74 [300 P.2d 110];
 
 Berry
 
 v.
 
 Chrome Crankshaft Co.,
 
 159 Cal.App.2d 549, 552 [324 P.2d 70]), it nevertheless is to be evaluated for what it is worth. We said, in
 
 Estate of Moore,
 
 at page 74: “Manifestly no court has held or would hold that hearsay, though received without objection, must be accepted in preference to sworn testimony to the contrary. The trial judge accepted Mrs. Farrell’s testimony in this regard, rejected the hearsay and committed no error in so doing.”
 

 All of the foregoing principles are applicable to solution of the questions of whether the evidence at bar is sufficient to support the finding of guilt and whether it establishes as matter of law a right to acquittal on the ground of self-defense, which is appellant’s main contention.
 

 Charged with murder defendant was convicted of voluntary manslaughter, a lesser and necessarily included offense. This crime is described in the statute as follows: “Manslaughter is the unlawful killing of a human being, without malice. It is
 
 *814
 
 of three kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. ...” (Pen. Code, § 192.)
 
 People
 
 v.
 
 Brubaker,
 
 53 Cal.2d 37, 44 [346 P.2d 8]: “Voluntary manslaughter is -a willful act, characterized by the presence of an intent to kill,
 
 engendered by sufficient provocation
 
 and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought. Section 192, subdivision 1, of the Penal Code defines voluntary manslaughter as the unlawful killing of a human being, without malice, ‘upon a sudden quarrel or heat of passion.’ To be sufficient to reduce a homicide to manslaughter, the heat of passion must be such as would
 
 naturally be aroused
 
 in the mind of an
 
 ordinary, reasonable person
 
 under the given facts and circumstances, or in the mind of a person of
 
 ordinary self-control. (People
 
 v.
 
 Bridgehouse,
 
 47 Cal.2d 406, 413 [l]-[2] [303 P.2d 1018].) ”
 

 The court’s ruling at bar gave defendant the benefit of an implied finding of a killing without malice and with an intent to kill engendered by sufficient provocation or heat of passion. “As defendant argues persuasively, ‘passion’ need not mean ‘rage’ or ‘anger.’ According to dictionary definition, ‘passion’ may be any ‘Violent, intense, high-wrought, or enthusiastic emotion.’ (Webster’s New International Dictionary, 2d ed.) As stated in
 
 People
 
 v.
 
 Logan
 
 (1917) 175 Cal. 45, 49 [164 P. 1121], . . . ‘the fundamental of the inquiry [in determining whether a homicide is voluntary manslaughter] is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and never, of course, the passion for revenge—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. ’ ”
 
 (People
 
 v.
 
 Borchers,
 
 50 Cal.2d 321, 329 [325 P.2d 97].) “And this heat of passion may result from terror as well as anger or jealousy.”
 
 (People
 
 v.
 
 Logan,
 
 175 Cal. 45, 49 [164 P. 1121].)
 

 The trial judge well may have reasoned that defendant found himself in the midst of a hostile crowd swinging belts and throwing bottles at him, and that this excited terror in him which precipitated his stabbing of Ortega and Navarro, and that this was a fear which a reasonable man would have entertained in the circumstances. But there was no proof as to how the fight started or who precipitated it except as found in defendant’s statement to the police. Lopez was the only person who had a knife; it had a blade 6 to 8 inches long, and was described by him as a dagger. Ortega was unarmed and
 
 *815
 
 although fighting with defendant did not present any such threat as a reasonable man would deem worthy of stabbing in return. Navarro was not fighting at all but he was stabbed by defendant. Fricke on California Criminal Law, seventh edition, page 154: “A defendant may not set up as a basis of the test his own disposition, his readiness to anger and fly into a passion or his voluntary intoxication. Neither is a defendant of unusually calm even disposition to be judged by his personal tendencies. Every defendant’s conduct must be measured by the reactions of the ordinary person of average disposition under like conditions. (See
 
 People
 
 v.
 
 Valentine,
 
 28 Cal.2d 121,137 [169 P.2d 1].) ” At page 169: “A bare fear on the part of the slayer that he [is] in danger of great bodily injury is not sufficient to justify a homicide but the circumstances must be such that a reasonable and prudent person, situated as was the slayer, would believe that the danger of great bodily injury was present and imminent and the killing must have occurred under a well founded belief that it was necessary to save himself from great bodily harm.”
 

 Non constat
 
 but that defendant himself started the fight. 25 California Jurisprudence 2d section 129, page 639; “It seems to be implicit in certain rulings that to make the Penal Code section on voluntary manslaughter applicable, neither quarrel nor passion must have their source in a provocation by the defendant. Thus, where a professional pugilist bent on exhibiting his fighting ability provoked a quarrel that resulted in a fistic encounter, and where he was not satisfied when he apparently prevailed therein, but, furious and angry, resorted to a deadly weapon with which he killed the other party, his claim that this was only voluntary manslaughter, committed on a sudden quarrel or heat of passion, was without merit, for both the quarrel and the heat of passion were the result of his own voluntary conduct.” Fricke on California Criminal Law, seventh edition, page 170: “Since the law will justify a homicide only when it appeared to the slayer, as a reasonable man, to have been necessary, it must also appear that the degree of resistance on the part of the slayer was not clearly disproportionate to the injury threatened. Thus, ordinarily, there would be no justification for killing if the threatened injury was an assault and battery, though if it were under circumstances justifying a belief that such assault and battery would cause grievous bodily injury and the killing appeared necessary to prevent imminent danger thereof it would be justified.”
 
 People
 
 v.
 
 Westlake,
 
 62 Cal. 303,
 
 *816
 
 308: "The right of self-defense, which justifies a homicide, does not include the right of attack."
 

 The judge did not credit defendant’s statement that about 15 people jumped on him as he got out of the Montez car and someone handed him a knife and told him to use it. This fact is evidenced by the trial judge’s remark made during the hearing of motion for new trial that defendant "came to the party which he was crashing with a knife"; also, "after all, he came to the party with a knife. He was an uninvited guest. As to how aggressive he was, or whether he was on the defensive, this is something else." Appellant’s counsel say these statements were based upon the probation report (which the judge was bound to consider; Pen Code, § 1203). We think it more probable it was the result of some logical deductions. The fight began on the lawn in front of the front house, then it worked over into the street and around the Montez car. Dying Ortega was lying in front of the house after he had been stabbed. Navarro was in the middle of the crowd when stabbed and inferentially was on the lawn, was not in the middle of the crowd when it surrounded the Montez automobile. No one saw a knife in the possession of anyone but defendant and he was not using it at the time the fight was in the street for he was trying to get in the car and Montez was holding the crowd off with a bumper jack. The knife had been thrown under the flowers in front of the house before defendant got to the place where he said someone handed it to him and said to use it.
 

 We refer again to the remarks above quoted from
 
 People
 
 v.
 
 Fuqua, supra,
 
 181 Cal.App.2d at page 524, to the effect that "if there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed." In so doing the judge may accept part and reject part of the evidence of a single witness if he does not act arbitrarily.
 
 (People
 
 v.
 
 Matlock,
 
 51 Cal.2d 682, 695 [336 P.2d 505, 71 A.L.R.2d 605];
 
 Nevarov
 
 v.
 
 Caldwell,
 
 161 Cal.App.2d 762, 777 [327 P.2d 111].)
 

 It is apparent that the trial judge dealt leniently with defendant in recognizing the existence of the considerable provocation necessary to reduce the crime to voluntary manslaughter.
 

 The foregoing discussion applies also to defendant’s claim of self-defense. The aggressor cannot succeed on that
 
 *817
 
 plea. (Fricke on California Criminal Law (7th ed.) p. 169; 25 Cal.Jur.2d § 282, p. 814.)
 

 Counsel, relying upon section 1105, Penal Code (quoted in footnote 1), argue that “under section 1105 it is necessary only that defendant produce evidence the weight of which is sufficient to create in the minds of the jurors a reasonable doubt as to the existence of the alleged circumstances which justified the homicide.” (Quoting
 
 People
 
 v.
 
 Carson,
 
 43 Cal.App.2d 40, 44 [110 P.2d 98].) (This same rule is stated in the concurring opinion in
 
 People
 
 v.
 
 Albertson,
 
 23 Cal.2d 550, 587 [145 P.2d 7].) But they overlook the concomitant rule that it is for the trier of facts (the judge here) to determine whether a reasonable doubt exists. “The ‘test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. ’ ”
 
 (People
 
 v.
 
 Poindexter,
 
 51 Cal.2d 142, 148 [330 P.2d 763].) The question of reasonable doubt is of course one of fact
 
 (People
 
 v.
 
 Daugherty, supra,
 
 40 Cal.2d 876, 885). The trial judge entertained no such doubt and there is no lack of evidence to sustain his implied finding upon this issue; hence it is binding here.
 

 Appellant’s argument upon the second count (the assault on Navarro) reads in its entirety as follows: “The verdict of the trial court finding the defendant guilty of assault with a deadly weapon is improper for the same reasons as those set forth in Points I and II, regarding the verdict of manslaughter.” This broad contention is adequately disposed of in our foregoing discussion of the case. It will be remembered that Navarro was not fighting, he was looking for his brother, got into the middle of the crowd and was stabbed by defendant.
 

 Defendant appealed only from the judgment but appellant’s briefs claim right to reversal of the order denying motion for new trial. This appeal was taken on December 13, 1961. By amendment of that year, effective before December 13, the right to appeal from such an order was limited to ‘ ‘ cases where the defendant is committed before final judgment for sexual psychopathy, insanity, or narcotics addiction”; in all other instances the review of such an order is had upon appeal from the final judgment (Pen. Code, § 1237). If an appeal from the order had been taken in this case it would have to be dismissed.
 

 The judgment is affirmed.
 

 Fox, P. J., and Herndon, J., concurred.
 

 [1]
 

 Penal Code, § 1105 provides: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of
 
 *812
 
 proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.”
 

 As to the effect of this section and the presumption of law that an unexplained killing is murder of the second degree, see, 25 Cal.Jur.2d § 39, p, 534; Frieke on California Criminal Evidence (5th e4.) p. 346.